FILED

AUG 3 0 1994

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

No. 94-020

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

---

IN THE MATTER OF J.J.G.,

A Youth In Need Of Care.

---

APPEAL FROM: District Court of the Seventeenth Judicial District, In and for the County of Phillips, The Honorable Leonard Langen, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

David L. Irving, Attorney at Law, Glasgow, Montana

For Respondent:

Jack Jenks, Deputy Phillips County Attorney, Malta, Montana

---

Submitted on Briefs: June 23, 1994

Decided: August 30, 1994

Filed:

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

On January 21, 1993, the Phillips County Attorney, on behalf of the Department of Family Services (DFS), filed a petition in the District Court for the Seventeenth Judicial District in Phillips County in which the court was requested to terminate the parent-child relationship of Mary Ann G. and her natural child, J.J.G., and to grant the DFS permanent legal custody of J.J.G. with the right to consent to his adoption. On February 2, 1993, Rick and Colleen Thompson, the foster parents of J.J.G. from the time of his birth until he was 18 months old, filed a petition in which they sought permanent custody of J.J.G. The District Court granted the petition filed on behalf of the DFS, and dismissed the Thompsons' petition on the basis that the Thompsons were without legal authority to request permanent custody of J.J.G. upon the termination of parental rights. The Thompsons appeal the order of the District Court.

We reverse.

We rephrase the issues on appeal as follows:

1.    Did the Thompsons file a timely notice of appeal?

2.    Did the District Court err when it denied the Thompsons' motion for medical and psychological evaluations of J.J.G.?

3.    Did the District Court err by stating its intention to award permanent legal custody of J.J.G. to the DFS prior to the dispositional hearing?

4.    Did the District Court err when it dismissed the Thompsons' petition for permanent legal custody of J.J.G. and

awarded the DFS permanent legal custody of J.J.G. with the right to consent to his adoption?

This litigation arises out of a dispute between the Phillips County DFS and Rick and Colleen Thompson concerning the welfare and proper placement of J.J.G., a youth in need of care with special needs.

J.J.G. was born on June 29, 1990. His attending physician concluded that he suffered from fetal alcohol syndrome. On July 3, 1990, based on this diagnosis and the DFS's documented concerns about whether the child's mother, Mary Ann G., could adequately care for him, J.J.G. was removed from the hospital and placed with foster parents, Rick and Colleen Thompson. The Thompsons are specially trained in special education and child development.

The Phillips County DFS petitioned the District Court for temporary investigative and protective services authority. This petition was granted on August 2, 1990, after the court found that there was probable cause to believe that J.J.G. was abused or neglected, or in danger of being abused or neglected, within the meaning of § 41-3-102, MCA.

The DFS prepared a social study in August 1990 in which it was noted that Mary Ann had failed to comply with treatment plans prior to J.J.G's birth, suffered from serious alcohol problems, had an I.Q. of 60, and was illiterate. The report also disclosed that Mary Ann had checked into an inpatient treatment program after J.J.G.'s birth but, unable to finance treatment, was released after being in the detoxification unit for approximately one day. It was

also noted that at eight weeks, J.J.G. was still experiencing alcohol withdrawal-like tremors and was at times inconsolable, frequently slept for only 10 to 15 minute intervals, and demanded constant physical attention from the Thompsons.

The report also noted that Mary Ann had an "adoptive brother and sister-in-law," Martin and Loreen Scholler in Washington State, who were very "supportive" of Mary Ann and were approved foster parents in that state. The Schollers had volunteered to be the main caretakers of J.J.G. until Mary Ann was able to complete a treatment plan and assume parental responsibilities.

In an addendum to this report prepared in January 1991, the DFS noted that it believed it would be beneficial to eventually relocate Mary Ann, J.J.G., and Mary Ann's two other children, who had also been placed in foster care in 1990, to Washington to live with the Schollers.

Through various stipulations and court orders, the DFS's temporary investigative authority and protective services order was extended until October 15, 1991. In a stipulation dated July 31, 1991, the Phillips County Attorney, counsel for J.J.G., and counsel for Mary Ann, agreed that a hearing would be held on or before October 15, 1991, to determine if J.J.G. was a youth in need of care pursuant to § 41-3-404, MCA.

During the hearing on this matter on September 6, 1991, the parties stipulated that J.J.G. should be adjudged a youth in need of care. However, the court refused to approve the DFS's proposed treatment plan because it included placement of the child in

4

Washington which the court believed would be "a mistake." In its order dated January 17, 1992, the court declared J.J.G. a youth in need of care and transferred legal custody of J.J.G. to the DFS pursuant to § 41-3-406(1)(c)(i), MCA.

Prior to the issuance of this order, the DFS made arrangements for J.J.G. and Mary Ann to reside with the Schollers in Washington. On January 8, 1992, counsel for J.J.G. requested a temporary restraining order to prevent the DFS or Mary Ann from taking J.J.G. to Washington. No action was taken on this motion, and on January 12, 1992, J.J.G. was removed from the Thompsons' home and traveled to Washington with Mary Ann.

One year later, on January 21, 1993, the DFS filed a petition in which it requested the court to terminate the parental rights of J.J.G.'s natural parents and to grant the DFS permanent legal custody of J.J.G. with the right to consent to his adoption. In a report attached to the petition, the DFS stated that Mary Ann had not followed the treatment plan prepared by the DFS, was no longer attending drug and alcohol counseling, had left the Scholler's home, and was no longer trying to parent J.J.G. because, in Mary Ann's words, parenting "feels overwhelming at this time."

The Thompsons, thereafter, filed a petition in which they sought permanent custody of J.J.G. The DFS moved to dismiss this petition. Without ruling on this motion, the court, by order dated May 7, 1993, ruled that the Thompsons and the Schollers could intervene in the proceedings on the DFS's petition to terminate parental rights and to obtain permanent legal custody of J.J.G.

5

By affidavit signed on July 6, 1993, Mary Ann waived all of her parental rights and waived her right to consent to the adoption of J.J.G.

On August 9, 1993, J.J.G.'s court-appointed guardian ad litem, Barbara Anderson, filed a report which was prepared after she personally met with J.J.G., the Schollers, the Thompsons, and the various professionals who had been providing services to J.J.G. in Montana and Washington. The report included numerous concerns about J.J.G.'s mental and physical well-being, and recommended that J.J.G. be permanently placed with the Thompsons. Furthermore, when the guardian ad litem testified during the September 9, 1993, dispositional hearing, she recommended, prior to any decision regarding placement or adoption, that J.J.G. be immediately evaluated by specialists in Montana who had monitored his progress from birth until the time he was removed to Washington.

On August 25, 1993, the court dismissed the Thompsons' petition for permanent custody of J.J.G. for the following reason:

> Under MCA 41-3-607 and 41-3-401, only the County Welfare Dept. or DFS can file a Petition for Termination of Parental Relationship. MCA 41-3-610 allows permanent placement of the child by DFS, and this is done subsequent to the Court Order terminating the parent-child relationship.

The court also amended its May 7, 1993, order and stated that the Thompsons and Schollers, as interested parties, could "appear to provide evidence" but that neither were allowed to seek permanent custody of J.J.G.:

> In Montana, the right to seek permanent custody rests solely with those agencies/individuals who would have the

6

right to give consent to adoption. Such position is consistent with §§ 41-3-607, MCA, et seq. and 41-3-401, MCA.

The court concluded that it could only review the placement actions of the DFS, but could not make the permanent placement itself and stated, with respect to the current action:

Should such Petition result in terminating the parental rights to the child, this Court must grant DFS, as Petitioner, the permanent custody with the right to consent to adoption.

Thus, prior to the dispositional hearing on the DFS's petition, the court ruled that the Thompsons were without authority to request permanent custody of J.J.G., and that, upon terminating parental rights, it had no alternative other than to award permanent custody of J.J.G. to the DFS.

On September 2, 1993, based on the guardian ad litem's report, the Thompsons filed a motion requesting that J.J.G. be returned to Montana for further medical and psychological evaluations by the Developmental Educational Assistance Program (DEAP). The DEAP, a private, nonprofit corporation based in Miles City, Montana, which does contract work for the State of Montana, had regularly tested and evaluated J.J.G.'s medical and psychological health while he was in the Thompsons' care. In a report issued in 1990, the DEAP had recommended regular evaluations and long-term therapy in order to deal with J.J.G.'s physical and emotional problems.

The Thompsons' motion was made pursuant to § 41-3-406(1)(d), MCA, which allows the court to order any party to the action to do what is necessary to give effect to the final disposition of a

7

youth in need of care, "including undertaking medical and psychological evaluations, treatment and counseling." The request for evaluations was made in order to acquire information on J.J.G.'s current condition for consideration at the dispositional hearing.

The dispositional hearing was held on September 9, 1993. During the hearing, prior to the time that the Thompsons were allowed to submit evidence and present witnesses, the court stated:

> I'm going to terminate the parental rights, I'm going to grant permanent custody to the Department of Family Services when all the rigmarole is completed. The only reason I'm going to let you introduce this evidence you've got here is so that it will be a part of the record so that it becomes something that the Department is going to have to decide.

At the conclusion of the dispositional hearing, the Thompsons again urged the court to grant their motion regarding medical and psychological evaluations of J.J.G. by the DEAP team in Montana. The presiding judge stated:

> I think that should be done. I think if they're [DFS] looking honestly out for the best interests of the child, they'll bring him back and get an evaluation by the same team that evaluated him at the time that they originally saw him. . . . I think they should have that evaluation and I think they're not doing their duty if they don't do it, I'll tell you that.

However, the court again concluded that it had no authority to order such an evaluation, stating, "I find nothing that's been produced to me here today to feel that I have any authority in these proceedings to order Social Services to do anything."

In its findings of fact, conclusions of law, and order issued subsequent to the hearing, the court found that the conduct of

8

Mary Ann "renders her unfit and unable to give the youth adequate parental care," and therefore, it was in J.J.G.'s best interest to terminate parental rights pursuant to § 41-3-609, MCA, and award permanent legal custody to "a qualified agency or individual having authority to develop a permanent placement plan for the youth." The court also noted that the Thompsons and the guardian ad litem expressed concern over the existing physical and emotional condition of J.J.G., and it stated that it would be in J.J.G.'s best interest to have the testimony of the DEAP professionals, as well as medical reports submitted by the Thompsons, considered by the DFS in its determination of a permanent placement for J.J.G.

Therefore, on September 16, 1993, the court terminated Mary Ann's parental rights and the natural father's parental rights (whose identity was in dispute) subject to his failure to show cause and object after being served with notice. Furthermore, the court awarded the DFS permanent custody of J.J.G. with the authority to consent to adoption. The court also concluded:

> This Court acts as a reviewing authority and does not have authority under sections 41-3-609 and 41-3-610, MCA, to order an evaluation of the youth in the preparation of the permanent placement plan for the youth. Any evaluation deemed necessary can be conducted by the agency vested with custody of the youth in preparation of a permanent placement plan.

On October 27, 1993, the natural father's parental rights were terminated after he was served with summons and failed to appear. The Thompsons, thereafter, filed a notice of appeal and petition for writ of supervisory control with this Court, requesting that the District Court be ordered to hold a new

9

dispositional hearing after a medical and psychological evaluation of J.J.G., and that they be allowed to seek custody of J.J.G. at this hearing. The petition for writ of supervisory control was denied on March 8, 1994, on the basis that these issues should be resolved through the appeal process.

## STANDARD OF REVIEW

In *Matter of D.H. and F.H.* (Mont. 1994), 872 P.2d 803, 805, 51 St. Rep. 386, 387-88, this Court clarified the standard of review to be used in cases involving a youth in need of care and the termination of parental rights. We concluded that the appropriate standard to be applied to purely factual findings in a proceeding to terminate parental rights is the clearly erroneous standard as set forth in *Interstate Production Credit Association v. DeSaye* (1991), 250 Mont. 320, 323, 820 P.2d 1285, 1287. Conclusions of law in a termination proceeding will be reviewed to determine if those conclusions are correct. *Matter of D.H. and F.H.*, 872 P.2d at 805.

## ISSUE 1

Did the Thompsons file a timely notice of appeal?

The DFS contends that the court's denial of the Thompsons' petition for custody should be affirmed because the Thompsons failed to file a timely notice of appeal. The DFS claims that the court's denial of the Thompsons' petition was mailed to all parties on August 25, 1993, and, pursuant to Rules 5(a)(1) and 21(c), M.R.App.P., the Thompsons' opportunity to appeal expired on

10

October 28, 1993. The DFS notes that the Thompsons did not file their notice of appeal until November 26, 1993.

We disagree with the contention that the Thompsons did not appeal in a timely manner. The record reveals that on September 3, 1993, the Thompsons filed an objection and motion to amend the court's August 25, 1993, order pursuant to Rules 52(b) and 59(g), M.R.Civ.P. This motion was deemed denied 45 days later after the court failed to rule on the motion. Rule 59(d), M.R.Civ.P. Rule 5(a)(4), M.R.App.P., provides that when a motion is made to alter or amend a judgment pursuant to Rules 52 or 59, M.R.Civ.P., the time for filing a notice of appeal runs from the entry of an order in which the motion is denied, or from the time the motion is deemed denied at the expiration of the 45-day period.

Here, the time for appeal did not start until the Thompsons' motion was deemed denied in mid-October. The notice of appeal, filed on November 26, 1993, was well within the 60-day time period provided for in Rule 5, M.R.App.P.

### ISSUE 2

Did the District Court err when it denied the Thompsons' motion for medical and psychological evaluations of J.J.G.?

The Thompsons contend the court erred when it concluded that it was without authority to order a medical and psychological evaluation of J.J.G. The Thompsons assert that sufficient evidence was presented to the court to demonstrate the need for such evaluations prior to the termination proceedings, but that the

11

court refused to order evaluations based on its erroneous conclusion that it was without authority to do so.

Section 41-3-609(3), MCA, provides as follows:

[I]n terminating the parent-child relationship, the court shall give primary consideration to the physical, mental, and emotional conditions and the needs of the child. The court shall review and, if necessary, order an evaluation of the child's or the parent's physical, mental, and emotional conditions.

Furthermore, when a petition for termination is filed pursuant to § 41-3-607(1), MCA, "[t]ermination of a parent-child legal relationship shall be considered at a dispositional hearing held pursuant to 41-3-406 . . .." Section 41-3-406(1), MCA, which sets forth the dispositions a court may make to protect the welfare of a youth in need of care, clearly states that a court may:

(d) order any party to the action to do what is necessary to give effect to the final disposition, including undertaking medical and psychological evaluations, treatment, and counseling . . . .

(Emphasis added.)

We disagree with the court's conclusion that it was without authority to order medical and psychological evaluations of J.J.G. by the DEAP professionals in Montana who had previously evaluated him. The relevant statutes clearly provide the court with the discretionary authority to order such evaluations.

In its responsive brief, the DFS acknowledges that it is within a court's discretion whether or not to order specific evaluations of a child prior to a termination proceeding. However, the DFS urges this Court to affirm the District Court's refusal to order an evaluation on the basis that there was substantial

12

evidence to support the court's decision to terminate parental rights without additional evaluations of J.J.G.

After reviewing the record and considering the evidence, however, we conclude otherwise. The court clearly stated that it believed an evaluation of J.J.G. was warranted and there is sufficient evidence in the record to support the court's finding in this regard. Contrary to the DFS's contention, the court's refusal to order an evaluation was not a discretionary decision based on its review of the evidence. Rather, as is demonstrated in the record, the court's decision was based on its erroneous conclusion of law.

The record reveals that evidence gathered by the guardian ad litem and reviewed by the DEAP professionals raised questions about the adequacy of care J.J.G. received after he was transferred to Washington. Also, the allegations contained in various reports or affidavits raised the question of whether J.J.G. suffered from abuse or neglect or from post-traumatic stress, depression, or other "flat affect" disorder. The court was presented with extensive testimony to the effect that the DEAP, which had conducted regular testing and evaluations of J.J.G. since his infancy, would be in the best position to evaluate J.J.G. and to make a comparative analysis of his condition since leaving the Thompsons' care.

We have made clear that, in a termination proceeding, the rights of the child must be given paramount consideration and must take precedence over the parental rights. *In the Matter of S.C.*

(Mont. 1994), 869 P.2d 266, 270, 129 St. Rep. 129, 132. Here, we conclude that the evidence supports the District Court's expressed finding that an immediate evaluation of J.J.G. by the DEAP was in the child's best interest.

We conclude that the District Court erred when it denied the Thompsons' motion. For this reason, and others discussed below, this matter is remanded to the District Court for the purpose of ordering a mental and psychological evaluation to be done by appropriate professionals designated by the court prior to a new dispositional hearing.

### ISSUE 3

Did the District Court err by stating its intention to award permanent legal custody of J.J.G. to the DFS prior to the dispositional hearing?

The Thompsons next contend that the court erred when it stated, on several occasions prior to the dispositional hearing, its intention to award the DFS permanent custody of J.J.G. upon termination of parental rights. The Thompsons cite *Matter of M.L.H.* (1986), 220 Mont. 288, 715 P.2d 32, as authority for the proposition that it is reversible error for a court to state its intention regarding an award of custody prior to the time that testimony is presented at the dispositional hearing.

We agree. As we stated in *Matter of M.L.H.*, 715 P.2d at 36, the mandate of § 41-3-406, MCA, is clear:

> A district court may make a dispositional order only after a dispositional hearing. We have cautioned

14

previously that "[t]o insure that the minors involved received the full protection of [custody] laws, these procedures should be 'rigorously followed.'" *In the Matter of Guardianship of Aschenbrenner* (1979), 182 Mont. 540, 553, 597 P.2d 1156, 1164. Here, the record indicates the District Court stated its intention to transfer custody to the State three times, and before the parties had the opportunity to present any evidence at the dispositional hearing. This is error and we reverse.

In this instance, the District Court stated its intention to transfer permanent custody of J.J.G. to the DFS several times prior to the time that evidence was considered at the dispositional hearing. In its August 25, 1993, memorandum and order, the court stated that, should parental rights be terminated in this matter, "this Court must grant DFS, as Petitioner, the permanent custody with the right to consent to adoption." Also, at the dispositional hearing, prior to the time that the Thompsons were allowed to submit evidence alleging that the DFS committed abuse and neglect by transferring J.J.G. to Washington, the court again announced that custody would be awarded to the DFS.

The record demonstrates that the court believed its only option upon terminating rights was to award custody to the DFS. Although this interpretation of the law may have prompted the court to make these statements regarding custody, this does not negate the error. Regardless of the court's rationale, the result is the same: the evidence adduced at the dispositional hearing was essentially disregarded by the court and the hearing itself was a mere formality. As we held in *Matter of M.L.H.*, this constitutes error and we reverse.

## ISSUE 4

Did the District Court err when it dismissed the Thompsons' petition for permanent legal custody of J.J.G. and awarded the DFS permanent legal custody of J.J.G. with the right to consent to his adoption?

The Thompsons contend that the District Court erred when it awarded the DFS permanent legal custody of J.J.G. in view of the evidence of abuse or neglect while J.J.G. was in the custody of the DFS and had been placed by the DFS with the Schollers in Washington. Furthermore, the Thompsons contend the court erred when it concluded that the Legislature made the DFS the exclusive party to whom custody could be given and denied them the right to seek custody of J.J.G. at the dispositional hearing.

A review of the record discloses several legal grounds which the District Court set forth as a basis for granting the DFS permanent legal custody to the exclusion of all other interested parties. In its August 25, 1993, order the court dismissed the Thompsons' petition and ruled that only the DFS could have custody because it alone has the authority to petition for termination of parental rights pursuant to § 41-3-607, MCA, and to file abuse, neglect, and dependency petitions pursuant to § 41-3-401, MCA. During the dispositional hearing, the court reiterated its belief that the Legislature took away the court's authority to award permanent custody to anyone other than the DFS and that it was constrained by this legislative mandate. Finally, in its order of September 16, 1993, the court concluded that the DFS was the proper

16

party with which to vest custody of J.J.G. because it is the agency which has the authority to make a permanent placement plan pursuant to § 41-3-610, MCA, and has the authority to place him for adoption pursuant to § 40-8-108, MCA.

The DFS, relying on the language of § 40-8-108, MCA, which states that a child may be placed for adoption only by the DFS, a licensed child-placing agency, or the child's parents, asserts that the court's legal conclusions were correct and that the Thompsons could not have received permanent custody of J.J.G. with the right to consent to his adoption.

The Thompsons' petition in which they sought permanent legal custody of J.J.G. was filed pursuant to § 41-3-406(1)(c)(iii), MCA, which allows a court, in order to protect the welfare of the child, to transfer legal custody of a youth in need of care, following a dispositional hearing, to an "individual who, after study by a social service agency designated by the court, is found by the court to be qualified to receive and care for the youth." In their petition, the Thompsons requested the court to grant them the "care, custody and control" of J.J.G. after termination of parental rights, and to deny the DFS's request for legal custody with the consent to adoption based on allegations that the DFS failed to properly provide for the best interests of J.J.G. when they placed him in out-of-state foster care.

After considering the pertinent statutes and reviewing the various petitions filed by the parties, we conclude that the court erred when it concluded that the Thompsons were without legal

17

authority to seek custody of J.J.G. and that it had no option other than to grant custody to the DFS.

Upon the filing of a petition for termination of parental rights, § 41-3-607(1), MCA, mandates that such a petition "shall be considered at a dispositional hearing held pursuant to 41-3-406." As set forth above, § 41-3-406, MCA, allows the court to transfer legal custody of a youth to several parties: the DFS, a child-placing agency, or an individual who, after study by a social service agency, is found to be qualified to receive and care for the youth.

This Court has made clear that a district court has discretionary authority to transfer legal custody to any qualified individual, including a non-relative, in order to protect the welfare of the youth. *Matter of S.P.* (1990), 241 Mont. 190, 786 P.2d 642. The paramount consideration in a court's exercise of this discretionary authority is the best interests of the youth. *Matter of S.P.* 786 P.2d at 648; *Matter of M.N.* (1982), 199 Mont. 407, 410, 649 P.2d 749, 751. In order for an individual to obtain permanent legal custody under this provision, it is not necessary for that individual to have the authority to consent to adoption or to seek termination of parental rights.

Pursuant to § 41-3-406(1)(c)(iii), MCA, we conclude that the Thompsons were entitled to seek legal custody of J.J.G. and the court, if it determined it was in J.J.G.'s best interests, could award permanent legal custody to the Thompsons.

18

We note that at one point during the proceedings the court discussed the alternatives set forth in this provision, but indicated that awarding custody to the Thompsons was really not an option because the DFS would most likely find the Thompsons not qualified to care for J.J.G. due to the ongoing dispute between the Thompsons and the DFS. However, under this provision, it is the court which has the authority to determine if an individual is qualified to care for a youth after the individual is studied by "a social service" agency designated by the court. Contrary to the court's apparent conclusion that it would be up to the DFS to determine if the Thompsons are qualified, the statute does not restrict the court to designate the DFS as the social service agency to evaluate the qualifications of an individual seeking custody.

In response to the DFS's argument that the Thompsons, even if they were granted legal custody, could not consent to J.J.G.'s adoption, we note that the Thompsons did not seek this authority. The Thompsons requested permanent legal custody of J.J.G. and petitioned the court to deny the DFS's request for custody with the right to consent to adoption. Furthermore, under § 40-8-111(d), MCA, once parental rights have been judicially terminated, any person having legal custody by court order qualifies for a consent to adopt by decree if the court having jurisdiction of the custody of the child also consents to adoption. Therefore, the fact that the Thompsons could not "place" J.J.G. for adoption under

19

§ 40-8-108, MCA, is not relevant to the question of whether the Thompsons have the right to seek permanent legal custody of J.J.G.

We conclude, based on the court's erroneous interpretation of the law, that the court erred when it dismissed the Thompsons' petition and granted permanent legal custody to the DFS. Because we are reversing on a question of law, we need not rule on the merits of whether the court's grant of custody to the DFS was in J.J.G.'s best interests and was supported by substantial evidence.

The District Court's order in which the DFS was awarded permanent legal custody is vacated and we remand for a new hearing to determine, based on J.J.G.'s best interests and a consideration of all relevant evidence, an award of permanent legal custody to any qualified agency or individual.

The District Court's order is reversed and vacated. The court is instructed to order a mental and psychological evaluation of J.J.G. by appropriate professionals designated by the court prior to a new dispositional hearing at which the Thompsons are entitled to seek permanent legal custody of J.J.G.

_____
Justice

We concur:

_____
Chief Justice

20

John Conway Harrison

William E. Hunt, Sr.

Karla M. Gray

_____

_____
Justices

21