No. 96-719

IN THE SUPREME COURT OF THE STATE OF MONTANA

1997


IN RE MATTER OF W.Z.,

Youth in Need of Care.



APPEAL FROM:          District Court of the Eighteenth Judicial District,
                         In and for the County of Gallatin,
                  The Honorable Thomas A. Olson, Judge presiding.



COUNSEL OF RECORD:

For Appellants:

Daniel B. Buckley; Berg, Lilly, Andriolo & Tollefsen;
        Bozeman, Montana  (for Appellant Father)

Derik Pomeroy; Morgan, Cameron & Weaver;
        Bozeman, Montana  (for Appellant Mother)

For Respondent:

Hon. Joseph P. Mazurek, Attorney General; Tammy K. Plubell,
        Assistant Attorney General; Helena, Montana

Marty Lambert, Gallatin County Attorney; Gary Balaz,
        Deputy County Attorney; Bozeman, Montana



Submitted on Briefs: July 17, 1997

Decided:   October 7, 1997
Filed:


_____
Clerk

Justice Jim Regnier delivered the opinion of the Court.

Appellants C.W.M. (mother) and T.Z. (father) appeal from an order of the Eighteenth Judicial District Court, Gallatin County, terminating appellants' parental rights over W.Z. For the reasons stated below, we affirm in part and reverse in part.

The following issues are present on appeal:

1. Did the District Court err in terminating the mother's parental rights?
2. Did the District Court err in terminating the father's parental rights?

FACTUAL BACKGROUND

W.Z. was born on November 4, 1991, to C.W.M., his biological mother, and T.Z., his biological father. The mother and father divorced in February 1994, following which the mother received custody of W.Z. Pursuant to the February 10, 1994, custody decree, the father received no visitation rights. In September 1994, while living, working, and attending school in Eau Claire, Wisconsin, the father petitioned the District Court to modify the decree's visitation order. The court granted the father's request, modifying the decree to permit him supervised visitation rights with his son.

Early in the morning on September 13, 1994, police officers responding to a call arrived at the mother's home in Belgrade, Montana, to find W.Z., then age two, home alone. Soon thereafter, officers located the mother, in an intoxicated condition, walking home from a local bar. The Department of Family Services (DFS) assumed protective custody of W.Z., and the mother was cited for endangering the welfare of a child. W.Z. remained in protective custody until September 20, 1994, at which point he was returned to his mother's custody.

The DFS petitioned for temporary investigative authority, and the court conducted a hearing on October 4, 1994. Without objection from the mother, the court granted DFS temporary investigative authority and protective services for a six-month period. The father, who was in Wisconsin at the time and whose location was unknown by DFS, was not present at the hearing. On November 25, 1994, the court approved a treatment plan for the mother which was intended to address, among other things, her chemical dependency.

At approximately 1 a.m. on January 12, 1995, shortly after the father arrived in Montana with the expressed intention of visiting his son, an officer from the Belgrade Police Department found W.Z. walking alone on some railroad tracks and subsequently found the mother in an intoxicated state. As a result of this incident, DFS removed W.Z. from his mother's home and placed him in foster care, where he has since remained.

The father did not see W.Z. during his return visit to Montana because W.Z. was removed from the mother's home shortly after the father's arrival in Montana. On January 14, 1995, the father and mother engaged in an altercation which resulted in domestic abuse charges against the mother and felony assault charges against the father. On January 27, 1995, the mother and father were involved in yet another dispute

which resulted in a felony assault charge against the father to which he pled guilty. The father received a six-year sentence pursuant to which he remains incarcerated at Montana State Prison. During his incarceration, the father has enrolled in anger management classes, the alternatives to violence project, and an addictive disease study program.

Citing the mother's failure to comply with her treatment plan and her failure to maintain sobriety as partial grounds, DFS filed a petition for temporary custody of W.Z. on April 4, 1995. A hearing was held on April 17, 1995, with both the father and mother in attendance. At the suggestion of the County Attorney, the court asked the father whether he would waive any appearance at future hearings since he was not the custodial parent, to which he agreed. The mother requested counsel, and the court reset the temporary custody hearing for May 23, 1995.

On August 15, 1995, following two continuances, the court again convened a hearing on DFS's petition for an additional six-month temporary custody and investigative period. The mother was intoxicated when she appeared for the second day of testimony, as evidenced by her disruptive behavior in court and the results of a court-ordered blood alcohol test. The father, who had waived his presence, remained incarcerated at the time of the hearing and did not appear. By stipulation of the parties, the court adjudicated W.Z. as a youth in need of care. At the conclusion of the hearing, the court granted DFS temporary custody of W.Z., and on November 9, 1995, the court approved a second treatment plan for the mother.

On December 22, 1995, the mother successfully completed an inpatient chemical dependency treatment program at Montana Chemical Dependency Center in Butte. On January 22, 1996, the mother was arrested for fraudulently obtaining dangerous drugs and subsequently pled guilty to that charge, receiving a three-year suspended sentence.

On February 15, 1996, DFS filed a petition to terminate both the mother's and father's parental rights. DFS sought to terminate the mother's parental rights on the basis that she had failed to successfully complete her treatment plan. It sought to terminate the father's parental rights on the basis that he abandoned W.Z., or, alternatively, that a treatment plan was impractical due to his imprisonment.

Following a hearing on April 11 and 12, 1996, at which both the mother and father were present, the District Court issued its findings of fact and conclusions of law terminating both the mother's and father's parental rights. It is from the termination of their parental rights that the mother and father now appeal.

DISCUSSION

The applicable standard of review for a district court's termination of

parental rights is whether the court interpreted the law correctly and whether the court's findings of fact are clearly erroneous. In re Matter of K.F.L. and N.L. (1996), 275 Mont. 102, 104, 910 P.2d 241, 243, (citing In re Matter of J.J.G. (1994), 266 Mont. 274, 281, 880 P.2d 808, 812).

In In re Matter of D.H. and F.H. (1994), 264 Mont. 521, 524, 872 P.2d 803, 805, we clarified the standard of review for cases involving a youth in need of care and termination of parental rights. The appropriate standard of review to be applied to purely factual findings in a termination of parental rights proceeding is the clearly erroneous standard as set forth in Interstate Production Credit Association v. DeSaye (1991), 250 Mont. 320, 323, 820 P.2d 1285, 1287. In re Matter of D.H., 264 Mont. at 524, 872 P.2d at 805 (see also In re Matter of J.J.G., 266 Mont. at 281, 880 P.2d at 812). We review conclusions of law in a termination proceeding to determine if those conclusions are correct. In re Matter of D.H. and F.H., 264 Mont. at 524, 872 P.2d at 805 (see also In re Matter of J.J.G., 266 Mont. at 281, 880 P.2d at 812).

This court has recognized that "a natural parent's right to care and custody of a child is a fundamental liberty interest, which must be protected by fundamentally fair procedures." In re Matter of R.B., Jr. (1985), 217 Mont. 99, 103, 703 P.2d 846, 848. Accordingly, prior to terminating an individual's parental rights, the district court must adequately address each applicable statutory requirement. In re Matter of R.B., Jr., 217 Mont. at 103, 703 P.2d at 848.

## ISSUE 1

Did the District Court err in terminating the mother's parental rights?

The State petitioned to terminate the mother's parental rights pursuant to 41-3-609(1)(c)(i) and (ii) (since renumbered 41-3-609(1)(e)(i) and (ii)), MCA, which provides as follows:

(1) The court may order a termination of the parent-child legal relationship upon a finding that any of the following circumstances exist:

. . . .

(c) the child is an adjudicated youth in need of care and both of the following exist:

(i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and

(ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time . . . .

Following the August 15, 1995, hearing on DFS's petition for temporary custody,

and by stipulation of the parties, the court adjudicated W.Z. as a youth in need of care.

The court approved the second of two appropriate treatment plans for the mother on November 9, 1995. Therefore, the first issue on appeal is whether the District Court erred in finding that the mother did not comply with, or successfully complete, her treatment plan. The second issue on appeal is whether the District Court erred in finding that the conduct and conditions which make the mother unfit to parent W.Z. are unlikely to change within a reasonable time. We address each issue in turn.

A.      Completion and success of appropriate treatment plan.

In its findings of fact and conclusions of law terminating the mother's parental rights, the District Court found that the mother did not complete either of her court-approved treatment plans, and that the plans were unsuccessful.

The record is replete with factual evidence which indicates the mother failed to comply with or successfully complete either of her treatment plans. Among the requirements of her first court-ordered treatment plan, approved by the court on November 25, 1994, were that the mother maintain sobriety, attend two AA meetings each week, and avoid leaving her son alone or without proper care. It is undisputed, however, that a mere two months after the plan's implementation, W.Z. was found wandering outside alone in the middle of the night while the mother was intoxicated.

The evidence further indicates the mother continued to consume alcohol and minimize her addiction. For example, the mother arrived at her social worker's office for two visits with W.Z. in February and March 1995, smelling of alcohol. On March 20, 1995, the mother refused to continue with the counseling sessions mandated by her treatment plan. In addition, the mother was intoxicated when she appeared for the second day of the August 15, 1995, hearing on DFS's petition for temporary custody. Accordingly, the District Court's finding that the mother failed to comply with her first treatment plan is supported by substantial evidence and is not clearly erroneous.

The factual record additionally supports the District Court's finding that the mother failed to complete her second treatment plan and that the plan was unsuccessful. Among the requirements of the mother's second treatment plan, approved by the court on November 9, 1995, were that she complete inpatient and aftercare alcohol treatment programs and continue to participate in AA. The plan further required that the mother abstain from consuming alcohol and drugs, avoid breaking the law, attend counseling sessions, and request visits with her son.

There is testimony in the record to support the court's finding that the mother continued to drink up until the time she began inpatient treatment in November 1995. Although the mother completed inpatient treatment as required, she failed to complete an aftercare program and failed to document her alleged continuing participation in AA. Although the mother claims she has maintained sobriety since completing inpatient treatment in December 1995, she was arrested for obtaining dangerous drugs with a

fraudulent prescription within weeks of completing treatment.  Further, the mother did
not participate in counseling, as required, and visited only infrequently with her son.

The mother argues, however, that because her second treatment plan had only been
in effect for three months when the State filed its petition to terminate her parental rights
in February 1996, she did not have adequate time to demonstrate that the plan had been
successful.  The mother notes that the State filed for termination of her parental rights
within two months of her discharge from inpatient chemical dependency treatment on
December 22, 1995.  Therefore, she argues, the State moved to terminate her rights just
weeks after she had finally gained control over her alcoholism.

The mother's argument that she did not have adequate time to demonstrate that the
treatment plan was a success presupposes that she complied with the objectives of the
plan and completed it.  As discussed above, we hold the District Court properly found
that the mother did not comply with either her first or second court-approved treatment
plan.  Further, this Court notes that, although the mother claims progress since the
implementation of her second treatment plan, she was arrested for fraudulently obtaining
dangerous drugs within weeks of completing inpatient treatment and roughly three weeks
before DFS filed its petition to terminate her parental rights.

Finally, the record indicates that DFS first became involved with the mother in
September 1994 in an attempt to help her improve her parenting skills and control her
chemical dependency.  In the two-year period following DFS's initial involvement and
the eventual filing of the petition to terminate her parental rights,  the mother consistently
failed to comply with either of the treatment plans approved for her.  Any progress made
by the mother in the two months prior to the filing of the petition does not accurately
reflect DFS's efforts to rehabilitate her relationship with W.Z. throughout the preceding
two years.  See In re Matter of B.T.B. and B.B. (1992), 254 Mont. 449, 452-53, 840
P.2d 558, 559-60 (citing In re Matter of M.J.D., C.K.D., A.R.D. (1987), 225 Mont.
200, 205, 731 P.2d 937, 939-40).  Based on the foregoing, we hold the court properly
found that the mother failed to successfully complete her second treatment plan.

B.     Likelihood that conduct and conditions rendering the mother unfit will change
       within a reasonable time.

In terminating the mother's parental rights, the District Court additionally found
that the conditions which make her unfit to parent her son are unlikely to change in a
reasonable time, and that continuation of the parent-child relationship will likely result

in the continued abuse or neglect of the child.

In so finding, the court reviewed the following factors set out in   41-3-609 (2), MCA:

(a)  emotional illness, mental illness, or mental deficiency of the parent of such duration or nature as to render the parent unlikely to care for the ongoing physical, mental, and emotional needs of the child within a reasonable time;

(b)  a history of violent behavior by the parent;

. . . .

(d)  excessive use of intoxicating liquor or of a narcotic or dangerous drug that affects the parent's ability to care and provide for the child;

. . . . [and]

(g)   any reasonable efforts by protective service agencies that have been unable to rehabilitate the parent.

The court found that the mother suffers from chronic emotional and mental problems such that she cannot care for W.Z.'s emotional needs and noted her history of violent encounters with the father.  The court additionally found that the mother's addiction to alcohol renders her unable to effectively parent her child.  Finally, the court recognized DFS's lengthy involvement with the mother and her continued inability to provide a stable home for her child, who has remained in foster care since January 12, 1995.

Substantial evidence of record clearly supports these findings by the District Court. For example, in a written assessment of the mother's fitness as a parent, clinical psychologist Frank Seitz identified her most significant problem as alcoholism. Furthermore, witness testimony at the termination hearing referred to the mother's longstanding alcoholic behavior.  Likewise, in an April 15, 1995, report, licensed counselor Joseph Scalia opined that the mother has a borderline personality defect. Incorporated into Dr. Seitz's August 14, 1995, court-ordered assessment of the mother's fitness as a parent, is the conclusion of Dr. Charles Kelly that the mother probably has a borderline personality disorder.  The record additionally reveals continued intervention by DFS on the mother's behalf for a period of time in excess of two years.  In light of these facts of record, the court did not err in finding that the conditions which make the mother unfit to parent her son are unlikely to change in a reasonable time.

Again, the mother argues that, at the time the State filed its petition to terminate her parental rights, she was in the midst of successfully altering her conduct and the conditions which had previously rendered her an unfit parent.  She points out that she successfully completed inpatient chemical dependency treatment just two months before the State filed its petition to terminate, and maintains she has not consumed

alcohol since.

The mother further argues she regularly attended AA meetings, and made extensive efforts to remain in contact with her son.

However, the record does not substantiate the mother's claim that she has been attending AA meetings, nor does it document efforts on her part to remain in contact with her son. Although the record contains no evidence that she has consumed alcohol since her release from inpatient treatment in December 1995, the District Court properly looked to the mother's extensive history of alcoholic behavior and inadequate parenting prior to finding that her conduct and behavior was unlikely to change within a reasonable time. In re Matter of K.F.L. and N.L. (1996), 275 Mont. 102, 106, 910 P.2d 241, 244.

Finally, pursuant to 41-3-609(3), MCA, in determining whether the condition or conduct rendering the mother unfit was likely to change within a reasonable time, the District Court was bound to "give primary consideration to the physical, mental, and emotional conditions and needs of the child." Indeed, the "best interest of the child is paramount and takes precedence over parental rights." In re Custody of T.M. (1994), 267 Mont. 75, 79, 881 P.2d 1333, 1336 (citing In re Matter of J.J.C.H. (1992), 252 Mont. 158, 165, 827 P.2d 812, 816). The record in this case clearly indicates, and the District Court correctly found, that the termination of the mother's parental rights was in W. Z.'s best interest. For example, W.Z.'s counselor testified at the termination hearing that the child was thriving in his foster home and opined that termination of the mother's parental rights would be in W.Z.'s best interests.

Based on the foregoing, we hold that the District Court correctly found that the mother failed to comply with and successfully complete her treatment plans, and that the conditions that made the mother unfit as a parent were unlikely to change within a reasonable time. Therefore, we hold that the District Court's findings of fact terminating the mother's parental rights are not clearly erroneous.

                              ISSUE 2

Did the District Court err in terminating the father's parental rights?

On February 15, 1996, the State petitioned to terminate the father's parental rights pursuant to 41-3-609(1)(b), MCA, which provides that the court may terminate the parent-child legal relationship upon finding that the child has been abandoned by the parents. The State alleged that the father abandoned W.Z. by committing crimes against the mother which he should have known would have resulted in his incarceration and inability to parent his son.

On March 19, 1996, the State filed an amended petition for the termination of

the father's parental rights, alternatively alleging that, prior to his incarceration at the Montana State Prison, the father abandoned W.Z. during the period extending from September 1994 through early January 1995.  The State additionally petitioned for termination of the father's parental rights pursuant to   41-3-609(1)(c) (since renumbered   41-3-609(1)(e)) and (4)(b), MCA, on the grounds that a treatment plan was not practical in light of the father's incarceration.

A.    Abandonment.

Without addressing the allegation that the father's incarceration constituted abandonment, the District Court found that the father had abandoned W.Z. "by not taking any steps to remedy the youth's situation during the period of September 1994 through early January 1995."  The court further found that "[b]efore his imprisonment the father showed [n]o inclination to support the child emotionally or financially" and noted that though the father "says he wants to be a parent, he has not manifested any firm intentions to do so."

The State must present clear and convincing evidence to demonstrate that the father abandoned W.Z. during the relevant period.  In re Matter of A.E., C.E., S.R., and J.R. (1992), 255 Mont. 56, 59, 840 P.2d 572, 574.  The District Court's determination of whether the father's actions during the relevant time period constitute abandonment is a factual one which will be upheld by this Court unless clearly erroneous.  See, i.e., In re Matter of R.B. (1985), 217 Mont. 99, 103, 703 P.2d 846, 848; In re Adoption of S.P.M. (1994), 266 Mont. 269, 271, 880 P.2d 297, 298.

In defining abandonment,   41-3-102(7)(e) (since renumbered   41-3-102(9)(f)), MCA, explains that a parent

>  abandons the child by leaving the child under circumstances that make reasonable the belief that the parent . . . does not intend to resume care of the child in the future or willfully surrenders physical custody for a period of 6 months and during that period does not manifest to the child and the person having physical custody of the child a firm intention to resume physical custody or to make permanent legal arrangements for the care of the child . . . .

(Emphasis added.)

We have previously held that the six-month requirement for establishing abandonment applies only to the second clause of this definition.  In re Matter of A.E., 255 Mont. at 60, 840 P.2d at 575.  The first clause applies where, as here, "a parent [allegedly] abandons a child under circumstances that make reasonable the belief the parent does not intend to resume care of the child."  No requisite time frame applies to this clause.  In re Matter of A.E., 255 Mont. at 60, 840 P.2d at 575.

In the instant case, the State alleges abandonment over a period of approximately four months. Pursuant to the relevant portion of 41-3-102(7)(e), MCA, the pertinent factual inquiry in this case is whether the father abandoned W.Z. from September 1994 through January 1995, and whether it was reasonable to believe that he did not intend to resume care of the child in the future.

This Court is aware that the father has an unimpressive history as a parent. The record indicates that the father has offered little, if any, financial or emotional support for his son in the past. The father, himself, testified that his son, now five years old, does not know him. The State, however, has alleged abandonment during the finite period from September 1994 to January 1995. Thus, the issue is whether the father abandoned his son during this specific time frame.

As the party seeking to establish abandonment, the State has the burden of demonstrating by clear and convincing evidence that the father abandoned W.Z. during the alleged time period. In re Matter of A.E., 255 Mont. at 59, 840 P.2d at 574. The State argues that the father was no more involved in W.Z.'s life during the fall of 1994 than he had ever been, and that it was reasonable to believe he had no intention of resuming, or assuming, care of the child in future.

Review of the record, however, indicates otherwise. For example, this court notes that in September 1994, the father petitioned the court to modify the February 10, 1994, dissolution decree to allow him supervised visitation with his son. Further, the father testified that, although he was living in Wisconsin at the time, he contacted the mother during the fall of 1994 to discuss W.Z.'s well-being and to schedule visitation in Montana. Indeed, the father flew back to Montana in January 1995, and testified that he did so with the intent of visiting his son. Before any visitation occurred, however, W.Z. was placed in foster-care where he has since remained.

This evidence does not support the District Court's finding that the father abandoned W.Z. during the period of September 1994 through early January 1995 by failing to take any steps to remedy W.Z.'s situation. We hold the State failed to sufficiently prove its allegations of abandonment during the relevant time period with clear and convincing evidence, and failed to adequately demonstrate that the statutory criteria of abandonment have been satisfied. Based on the foregoing, we hold the District Court erred in finding that the father abandoned W.Z. from September 1994 through early January 1995, and reverse the lower court on this issue.

B. Practicality of treatment plan.

The State additionally petitioned to terminate the father's parental rights pursuant

to 41-3-609(1)(c) (since renumbered 41-3-609(1)(e)) and (4)(b), MCA, on the grounds that a treatment plan was not practical in light of the father's incarceration. Because we reverse the District Court's determination that the father abandoned his son in the fall of 1994, we must next address this issue and determine whether the District Court erred in finding that a treatment plan was impractical in light of the father's incarceration.

Section 41-3-609(4)(b), MCA, provides an exception to the requirement that the court approve an appropriate treatment plan prior to the termination of parental rights and states that:

(4) A treatment plan is not required under this part upon a finding by the court following hearing if:

(b) the parent is incarcerated for more than 1 year and a treatment plan is not practical considering the incarceration . . . .

In terminating the father's parental rights, the court recognized that no treatment plan was in effect, and concluded that one was unnecessary pursuant to 41-3-609(4)(b), MCA. As the court correctly noted, the father had been incarcerated for more than one year. Accordingly, the court then turned to the question of whether a treatment plan was practical considering the father's incarceration. The court found that such a plan was in fact impractical because the father's release date was not known. The court further noted that the father had shown minimal interest in the child, and had provided the mother and W.Z. with little financial or emotional support in the past.

Although the District Court found that a treatment plan was impractical in light of the father's incarceration, the record does not support such a finding. We have previously stated that "we sound a stern warning that this Court will not permit the termination of parental rights without first establishing a treatment plan unless a showing of facts clearly proves the impossibility of any workable plan." In re Matter of R.B., Jr. (1985), 217 Mont. 99, 105, 703 P.2d 846, 849 (citing In re Matter of C.L.R. (1984), 211 Mont. 381, 386, 685 P.2d 926, 928 (superseded by statute as stated in In Matter of Baby Boy Scott (1988), 235 Mont. 253, 767 P.2d 298)). The record presently before this Court contains no such showing of facts.

It is apparent from the record that neither DFS nor the social worker involved in the case ever presented the father with a proposed treatment plan, or even discussed with him the possibility of implementing one. At the termination hearing, the social

worker testified that it would be difficult to implement a plan for the father while incarcerated, but conceded that certain prison programs might have been incorporated into a potential treatment plan.

In finding a treatment plan would be impractical, the court also relied, in part, on the fact that the father had shown little interest in his son in the past. Although the fact that the father has historically shown little or no interest in his son's life indicates he might well have failed to comply with any court-approved treatment plan, given the fact that no treatment plan was ever attempted, such a finding is mere speculation.

The present record simply does not support the District Court's finding that implementation of a treatment plan would have been impractical under the circumstances of this case. We hold the State failed to demonstrate that a treatment plan would have been impractical in light of the father's incarceration.

Having held that the District Court erred in finding the father abandoned W.Z., and erred in finding a treatment plan was impractical, we reverse the court's termination of the father's parental rights.

/S/  JIM REGNIER


We Concur:

/S/  J. A.  TURNAGE
/S/  KARLA M. GRAY
/S/  JAMES C. NELSON
/S/  TERRY N. TRIEWEILER