No. 98-401

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 341

IN THE MATTER OF M.A.E.,

A YOUTH IN NEED OF CARE

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Yellowstone,

The Honorable G. Todd Baugh, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Kevin Gillen, Gillen Law Office, Billings, Montana

Guardian Ad Litem:

Damon L. Gannett, Attorney at Law, Billings, Montana

For Respondent:

Hon. Joseph P. Mazurek, Montana Attorney General, John Paulson, Assistant Montana Attorney General, Helena, Montana; Dennis Paxinos, Yellowstone County Attorney, Melanie Logan, Deputy Yellowstone County Attorney, Billings, Montana

Submitted on Briefs: November 18, 1999

Decided: December 29, 1999

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶ Amanda Z. (Amanda), the natural mother of M.A.E., appeals from the Findings of Fact and Conclusions of Law entered by the Thirteenth Judicial District Court, Yellowstone County, terminating her parental rights to M.A.E., and awarding permanent legal custody with the right to consent to adoption to the Montana Department of Public Health and Human Services (hereinafter Department). We affirm.

¶ We restate the issues raised on appeal as follows:

1. Did the District Court abuse its discretion when it concluded that Amanda did not comply with the court-approved treatment plan, or that the plan was not successful?

2. Did the District Court abuse its discretion when it concluded that the conduct or condition that rendered Amanda unfit as a parent was unlikely to change within a reasonable time?

## Factual and Procedural Background

¶ Amanda Z. gave birth to M.A.E. on September 17, 1996. Terry O. is believed to be the natural father of M.A.E., and his parenting rights are not at issue in this appeal. M.A.E. has been in foster care since March 21, 1997, and in the same foster home since June of 1997. Amanda is currently incarcerated in the Montana State Women's Correctional Facility, for forgery and felony possession of dangerous drugs convictions.

¶ The Department's involvement with Amanda's parenting rights began in March of 1997. Amanda was not incarcerated at that time. On the morning of March 11, Amanda appeared before the District Court for the purpose of setting bond in proceedings for the revocation of her suspended sentence for forgery. Amanda had tested positive for methamphetamine on three occasions, which violated the terms of her intensive supervision parole program. None of these positive tests occurred during her pregnancy with M.A.E., but she would later testify that she had been under the influence of methamphetamine while caring for the infant, and had, in fact, become addicted to the substance.

¶ The intensive supervision parole program began in 1996 following her parole from prison in South Dakota on a criminal possession of dangerous drugs conviction. Amanda had violated her original parole in Montana pursuant to her forgery conviction when she left the state and moved to South Dakota. Upon her parole there, she was then extradited back to Montana.

¶ Shortly after the brief hearing on March 11, 1997, her parole officer found her in a bar, with M.A.E. and Terry O., the child's father. The fact that the six-month old M.A.E. was found strapped or tied to a bar stool with a blanket at the time is not disputed. Amanda alleged that she went to the bar following the hearing to seek a ride from Terry.

Nevertheless, Amanda was arrested for violating the conditions of her intensive supervision program, which prohibited her from entering any establishment that served alcohol.

¶ In April, Amanda was offered a chance to avoid revocation of her suspended sentence if she successfully completed a chemical dependency program. Several weeks after entering the program, however, her participation was terminated following a positive drug test. On May 27, 1997, Amanda's suspended sentence was revoked and she was sentenced to three years in the Women's Correctional Facility. Notwithstanding the possibility of early parole, the completion of her sentence would require that she remain in prison until November of 1998.

¶ During this time, Amanda agreed to and signed a Department treatment plan on May 22, 1997. The plan was approved by the court on June 2, 1997. The May-September plan did not take into account the fact that Amanda's sentence would be revoked and that she would serve time in prison. Later testimony indicated, in fact, that the plan's goals and tasks were specifically tailored to a parent who was not incarcerated.

¶ With regards to M.A.E., the Department filed a petition for temporary investigative authority and protective services on March 14, 1997. This petition was granted by the District Court on March 19, 1997. A hearing on the petition was held April 7, 1997. In the meantime, M.A.E. had been removed from the custody of Terry, and placed in foster care. The Department filed a petition for temporary custody on June 12, 1997. Following a hearing, this request was granted by the District Court on August 21, which determined that M.A.E. was a youth in need of care, pursuant to § 41-3-102, MCA.

¶ With Amanda now in prison, her Department case worker developed a new treatment plan, which Amanda signed on October 16, 1997, and which the court approved on October 27, 1997. The new plan was necessarily two-fold, the first part requiring certain steps that Amanda would take while in prison in improving her parenting skills and overcoming her drug use; the second part involved further steps she would be required to take following her release. The first phase of the treatment plan stated that it covered the period from September 19, 1997, to February 19, 1998. The second phase would have been drafted upon Amanda's release, and later testimony indicated that it would have taken a minimum of six months to complete. After the court approved the plan, it appointed Amanda legal counsel on November 18, 1997.

¶ A petition for permanent legal custody, termination of parental rights and right to consent to adoption was filed by the Department on December 10, 1997. The petition apparently resulted not from Amanda's conduct in following the terms of the new treatment plan, but her conduct while in prison. Shortly after the revocation of her suspended sentence, Amanda executed a plan to steal Valium from a nurse's cart at the county detention facility. She then allegedly dispensed the stolen drugs to other inmates, and ingested a quantity sufficient to require hospitalization. She testified later that at the time she was still under the influence of alcohol and methamphetamine, although she had been incarcerated for over a week. Following this June incident, she was charged with criminal possession and sale of dangerous drugs, and theft. In August of 1997, she pled guilty to the possession charge, and was apparently given a consecutive three-year prison sentence.

¶ Amanda also had two altercations, or "severes," with other inmates in the fall of 1997. She received several "write-ups" for these incidents as well as other minor infractions of inmate conduct rules. As a result, Amanda was moved to the "close custody" area of the prison, which involved a reduction of her privileges, including greater restrictions on her visitation rights.

¶ The hearing on the parental rights termination petition took place on two days, February 9, 1998, and March 30, 1998. The District Court issued its Findings of Fact and Conclusions of Law on May 4, 1998. The court terminated both Amanda's and Terry's parental rights to M.A.E., and awarded permanent legal custody with the right to consent to adoption to the Montana Department of Public Health and Human Services.

¶ With regards to Amanda, the court specifically found that "it is unlikely she will be in a position to parent within the foreseeable future;" she "shows that she has little interest in doing what needs to be done to be in a position to parent this infant;" none of the treatment plan goals were achieved; "none of the treatment plans were successfully completed;" and, the "treatment plans were not successful in rehabilitating Amanda to properly parent this infant, and that situation is not likely to resolve in a reasonable time."

¶ The court concluded that M.A.E. continued to be a youth in need of care, the clear and convincing evidence established that continued custody by Amanda would result in serious emotional and physical damage to M.A.E., and continuation of the parent-child relationship between Amanda and M.A.E. would result in the continued endangerment and neglect of the child. The court further concluded that it was in M.A.E.'s best interest to

terminate the parent-child relationship between M.A.E. and Amanda.

¶ From this judgment, Amanda now appeals.

## Standard of Review

¶ This Court reviews a district court's conclusions of law to determine whether the court interpreted the law correctly. *See In re J.N.*, 1999 MT 64, ¶ 11, 293 Mont. 524, ¶ 11, 977 P.2d 317, ¶ 11 (citations omitted). We review a court's findings of fact to determine whether the court's findings are clearly erroneous. *In re J.N.*, ¶ 11 (citations omitted). A finding of fact is clearly erroneous if it is not supported by substantial evidence; if the district court misapprehended the effect of the evidence; or, if after reviewing the record, this Court is left with a definite and firm conviction that the district court made a mistake. *In re J.N.*, ¶ 11 (citations omitted).

¶ This Court has further stated that "a natural parent's right to care and custody of a child is a fundamental liberty interest, which must be protected by fundamentally fair procedures." *In re J.N.*, ¶ 12 (quoting *Matter of R.B., Jr.* (1985), 217 Mont. 99, 103, 703 P.2d 846, 848) (citations omitted). Thus, a district court must adequately address each applicable statutory requirement before terminating an individual's parental rights. *In re J. N.*, ¶ 12 (citations omitted). Additionally, the party seeking to terminate an individual's parental rights has the burden of proving by clear and convincing evidence that the statutory criteria for termination have been met. *In re J.N.*, ¶ 12 (citations omitted).

## Discussion

¶ The District Court reached its determination to terminate Amanda's parental rights based on the following criteria, pursuant to § 41-3-609, MCA (1997):

> (1) The court may order a termination of the parent-child legal relationship upon a finding that any of the following circumstances exist:
>
> . . .
>
> (e) the child is an adjudicated youth in need of care and both of the following exist:
>
> (i) an appropriate treatment plan that has been approved by the court has not

been complied with by the parents or has not been successful; and

(ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time; or

(f) the parent has substantially failed to successfully complete or meet the goals of a treatment plan approved by the court and the child has been in an out-of-home placement for a cumulative total period of 1 year or longer.

Thus, under subsection (e), the court must follow a three step process: (1) the child must be adjudicated a youth in need of care; (2) it must be found that an appropriate treatment plan has not been complied with or has not been successful; and, (3) it must be found that the unfit conduct or condition of the parent is unlikely to change within a reasonable time. On appeal, Amanda does not contest the District Court's finding that M.A.E. was a youth in need of care. We therefore will first address the second step under subsection (e)(i), which in turn determines whether subsection (f) is appropriate for termination as well.

## Issue 1.

### *Did the District Court abuse its discretion when it concluded that Amanda did not comply with the court-approved treatment plan, or that the plan was not successful?*

¶ In summarizing Amanda's contentions on appeal, she argues that there is no evidence that she failed to comply with the first phase of the second treatment plan, and suggests that the first treatment plan that the court approved in June of 1997, should be disregarded because it did not take into account her incarceration.

¶ Under § 41-3-609, MCA, subsections (e)(i) or (f) (which has been subsequently repealed) require that a district court's findings and conclusions show that the parent has not, to some degree, complied with a court-approved treatment plan, or that the plan has not been successful. Only under § 41-3-609(4)(b), MCA, where a parent is incarcerated for more than one year, is a treatment plan not required. That particular subsection could apply to the factual circumstances here, but it was not raised by any of the parties, or addressed by the District Court in its findings of fact and conclusions of law.

¶ On appeal, Amanda points to the undisputed fact that the District Court issued findings and conclusions that essentially treat the two treatment plans as one. The court found that "none of the treatment *plans* were successfully completed," and therefore concluded that Amanda had not complied with the plans, and the "plans were not successful." Amanda points out that the first plan was formulated prior to the May 27, 1997 revocation of her suspended sentence, and was nevertheless approved by the court on June 2, 1997. She argues that it is also undisputed that she substantially complied with the terms of the second treatment plan from the time it was approved, on October 27, 1997, until the final hearing date, on March 30, 1998.

### A. Did the second treatment plan supersede the first plan?

¶ The foregoing raises a key point of law in interpreting the legislative mandate of § 41-3-609, MCA. Under the factual circumstances, did the second treatment plan supersede the prior treatment plan? In other words, once the court approved a substantially different second plan in October of 1997, to take into account Amanda's incarceration, did the evidence of compliance with the goals and tasks of the first plan, or its "success," become irrelevant in addressing the termination criteria under § 41-3-609(1)(e)(i)?

¶ Our case law provides some guidance. For example, in *In re J.N.*, 1999 MT 64, 293 Mont. 524, 977 P.2d 317, this Court determined that a court-approved treatment plan does not necessarily have to take into account the parent's incarceration in order to be deemed "appropriate." We concluded that a decisive factor in determining whether a plan is appropriate is whether it is directed at "problems facing the parent and the child." *In re J. N.*, ¶ 16. We stated:

> [A]lthough we agree . . . that most of her treatment plan was designed for a person who was not incarcerated, the record shows that her treatment plan was drafted when she had a chance of being released from prison within four months and that she was told that some of the programs offered at the prison where she was incarcerated would satisfy the requirements of her treatment plan.

*In re J.N.*, ¶ 19. Here, however, we are confronted with a strictly non-incarceration treatment plan, some of which clearly could not be complied with or successfully completed by Amanda while in prison, followed by a second treatment plan, which was specifically tailored to Amanda's incarceration, and was therefore far more appropriate in

addressing the "problems facing the parent and the child." The second plan does not incorporate by reference the goals and tasks of the first plan, or suggest that compliance with the first plan would have any bearing on whether Amanda could retain her parental rights. Rather, the second plan states:

> The social worker will make a recommendation to the Youth Court as to whether the child should be returned to [the mother's] home. This recommendation will be contingent upon [the mother's] completion of the tasks described in this agreement, her release from prison, and the Department's recommendation that she is adequately capable of caring for her children.

¶ In reading the foregoing, it would only have been reasonable for Amanda to presume that compliance with its terms, and a finding that the plan was successful, may have eventually led to the resumption of her parental rights to M.A.E. Furthermore, we also identified in *In re J.N.* the factor of *whether the parent was represented by counsel at the time the plan was approved. See In re J.N., ¶ 16. Here, Amanda apparently was not represented by counsel until after the court approved the plan.*

¶ *Additionally, we are mindful here of a line of parental rights termination cases, several of which were cited by Amanda, where we emphasized that a natural parent's "right to care and custody of a child is a fundamental liberty interest, which must be protected by fundamentally fair procedures." In re J.F., 1999 MT 131, ¶ 15, 294 Mont. 494, ¶ 15, 982 P.2d 1011, ¶ 15 (quoting Matter of R.B. (1985), 217 Mont. 99, 103, 703 P.2d 846, 848). See also Matter of W.Z. (1997), 285 Mont. 16, 29, 946 P.2d 125, 133; Matter of J.S. (1994), 269 Mont. 170, 178-79, 887 P.2d 719, 724 (Gray, J., concurring). We therefore conclude that the second treatment plan, approved by the District Court on October 27, 1997, superseded the first treatment plan approved June 2, 1997, as a matter of law. Accordingly, in determining whether Amanda complied with "an appropriate treatment plan" or whether the plan was "successful," pursuant to § 41-3-609(1)(e)(i), or whether she substantially failed to successfully complete or meet the goals of a treatment plan, pursuant to § 41-3-609(1)(f), we conclude the District Court should have considered only the second court-approved plan.*

¶ *Applying this conclusion to the record, we hold that the District Court abused its discretion when it incorrectly concluded that Amanda had not complied with the "treatment plans," meaning both, and that both were not successful. We next turn to whether the Districts Court's findings and conclusions regarding the second treatment plan, alone, were sufficient to terminate Amanda's parental rights.*

### B. Was the evidence clear and convincing that Amanda did not comply with the second treatment plan, or that the plan was not successful?

No

*¶ As the above discussion suggests, the District Court's findings and conclusions did not distinguish between the two treatment plans, nor did the State's petition for termination of parental rights. Rather, the court concluded that the plans as a whole were not complied with or were not successful. Amanda argues that she offered substantial evidence that she complied with the second plan. We agree.*

*¶ On appeal, the State as well as M.A.E.'s guardian ad litem concede that Amanda had, at the time of the February and March termination hearings, substantially complied with the first phase of the second plan. This concession is further supported by the testimony of the State's witnesses. For example, Amanda's case worker, who drafted both plans, testified that Amanda had complied with the first phase of the treatment plan in addressing her chemical dependency and parenting issues. Amanda's parole officer testified that Amanda had either completed, or was continuing to work on, the required treatment classes in compliance with the first phase of the second treatment plan. A review of all evidence, in fact, fails to provide even a hint that Amanda had not complied with any of the goals and tasks of the first phase of the second plan.*

*¶ We therefore hold that the District Court abused its discretion when it concluded that Amanda did not comply with the second treatment plan. This determination was not supported by clear and convincing evidence, and was therefore incorrect. Accordingly, this holding necessarily precludes termination of Amanda's parental rights under § 41-3-609(f), MCA, as well.*

*¶ Even upon reaching a conclusion that a parent has complied with a treatment plan, however, a district court, pursuant to § 41-3-609(1)(e)(i), still has the discretion to determine whether the evidence demonstrates that a treatment plan has been "successful." See, e.g., Matter of S.C. (1994), 264 Mont. 24, 29, 869 P.2d 266, 269 (concluding that the district court properly determined that even though the treatment plans were appropriate and were complied with, they were not successful in resolving the parent's long-term mental illness problems). Based on its findings of fact, the District Court here concluded that both plans were not successful. Accordingly, we will address whether this conclusion was correct as to only the second plan.*

*¶ In principle, this case is no different from our decision in Matter of R.B.O. (1996), 277 Mont. 272, 921 P.2d 268, where we affirmed the district court's conclusion that a treatment plan was not "successful" due to the mother's re-incarceration and continued drug use following the expiration of a court-approved treatment plan. See Matter of R.B.O., 277 Mont. at 281, 921 P.2d at 273. The record there indicated that the mother of R.B.O. had fully complied with the plan while incarcerated, but then had frustrated the purposes of the plan by her own post-plan conduct, which she latn*