No. 99-043

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 121N

IN THE MATTER OF T.F., B.F., and B.F.,

Youths in Need of Care

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Yellowstone,

The Honorable Diane G. Barz, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Bruce J. Allison, Allison Law Office, Billings, Montana (Diane Black); Bard Middleton, Middleton & Stewart, Billings, Montana (Jerry Fitch); Damon Gannett, Gannett Law Firm, Billings, Montana (Guardian ad litem)

For Respondent:

Joseph P. Mazurek, Montana Attorney General, Mark W. Mattioli, Assistant Montana Attorney General; Dennis Paxinos, Yellowstone County Attorney, Melanie Logan, Deputy Yellowstone County Attorney; Suzanne Braun, Department of Public Health & Human Services, Billings, Montana (Community Social Worker II)

_____

Submitted on Briefs: April 20, 2000

Decided: May 4, 2000

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

1. ¶Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent. The decision shall be filed as a public document with the Clerk of the Supreme Court and shall be

reported by case title, Supreme Court cause number, and result, to the State Reporter Publishing Company and to West Group in the quarterly table of non-citable cases issued by this Court.

2. ¶Diane B., the biological mother of T.F., B.F., and B.F., appeals from a judgment of the Thirteenth Judicial District Court, Yellowstone County, terminating her parental rights over the three minor children, and awarding permanent legal custody with the right to consent to adoption to the Montana Department of Public Health and Human Services (hereinafter, Department). We affirm.

3. ¶Diane raises one issue on appeal:

Was there sufficient evidence to support termination of the natural mother's parental rights?

## Factual and Procedural Background

1. ¶Diane's parental rights were terminated by the District Court on October 20, 1998, following a September 1998 hearing. Diane and Jerry F. are the biological parents of T.F., B.F., and B.F., whose ages are now eight, six, and three, respectively. Jerry F.'s parental rights were also terminated in this proceeding. He is not a party to this appeal.

2. ¶At the time of the hearing, T.F. had spent approximately half her life in foster care; the youngest, B.F., had spent all three years of her life in foster care. It is undisputed that the three children, all in the custody and care of Diane's older sister, are doing well, in a stable home. It is likewise undisputed that Diane's relationship with Jerry is a long, bleak story of alcohol and substance abuse mixed with episodes of gambling binges, physical violence, arrests and incarcerations.

3. ¶The hearing culminated the Department's intervention into the affairs of Diane and her family that began in 1991. In that year, after receiving numerous reports of alcohol abuse and physical neglect of her minor children (Diane has five other children in addition to the three here, none of which remain in her custody), the Department substantiated physical neglect in June 1991, and July 1992, but the children were not removed. Diane, in fact, was arrested in 1991 for child endangerment after being found intoxicated and wandering between bars with her one-and-a-half year old son. Similar reports continued throughout 1993 and 1994.

4. ¶In June of 1995, however, her children were removed following an incident where Diane, while intoxicated, fell and injured her oldest daughter, T.F. The Department

was granted temporary investigative authority, and Diane was provided a treatment plan. The children were placed in the custody of Diane's sister during this time and were briefly returned to Diane's care in December of 1995.

5. ¶On January 25, 1996, the Department was notified that Jerry F. had assaulted Diane. Alcohol was again a prime suspect in the incident. It was determined that Diane, who was pregnant with the youngest B.F. at the time, was unable to care for her children, due to her alcohol abuse. The Department again filed for temporary investigative authority, which was granted. The children were returned to the care of Diane's sister.

6. ¶During that year, Diane made minimal compliance with four treatment plans, and B.F. was removed from Diane immediately after giving birth in May, and placed with Diane's sister.

7. ¶On January 6, 1997, Diane informed her caseworker that Jerry F. had been arrested for causing damage to their home, assaulting her, and threatening her life. Apparently, he had hung a noose from the rafters in their garage, and had threatened to hang her and make it look like a suicide. Although she provided this information to the police, she would later recant this version of the events.

8. ¶Shortly after his release from jail, Jerry F. was re-incarcerated for disobeying an order to have no contact with Diane. Jerry F. ultimately pled guilty to misdemeanor assault in November of 1997. During this time Diane testified in a deposition, recounting past altercations with Jerry in which her nose had been broken, in which her ribs had been broken, and in which she had been choked and punched. She also testified that she would be unwilling to testify against him.

9. ¶Following Diane's fifth treatment plan, which commenced in March 1997, the Department petitioned for permanent custody and termination of parental rights in July, 1997. A permanent custody hearing took place in November. The hearing was suspended after the District Court determined that more information was needed. The court required that Diane and Jerry submit to psychological evaluations, weekly urinalysis and breathalyser tests, and to attend weekly visits with the children for 90 days. The District Court also ordered the Department to issue new treatment plans during this time. Finally, the court informed Diane and Jerry that any domestic reports would result in an immediate resumption of the hearing.

10. ¶During the period between November 24, 1997, to February 17, 1998, Diane was scheduled to submit to several urinalysis tests. One tested positive for amphetamines, she failed to provided samples on four other occasions, and she tested negative six times. Under the terms of her substance testing agreement, a failure to provide a sample is deemed a positive test.

11. ¶In February of 1998, the Department again petitioned for termination of parental rights. Diane subsequently entered into voluntary treatment plans in February, June, and July of 1998. Diane did not submit to any substance testing from February 23 to September 14, 1998, as required by her treatment plans, although she did attempt to finally sign up for tests in August, which led to a verbal altercation with staff at the testing facility. Between November of 1997 and September of 1998, Diane also missed numerous scheduled visitations with her minor children, which were also required by her treatment plans.

12. ¶A hearing on the Department's petition took place in September. Although Diane conceded that she did not complete all random urinalysis tests and missed visits with the children as required by her treatment plans, she contended that based on a report by Dr. Honeyman, she had the ability to adequately parent in the future if she continued in counseling and did not continue any substance abuse.

13. ¶Bruce Chessen, a licensed psychologist, testified that based on his tests and evaluations of both parents--which he conducted in 1997--it was unlikely Diane would be able to adequately parent in the future. He acknowledged that Diane could benefit from counseling, but he noted that her problems were deeply ingrained. With an extensive history of alcoholism and abusive relationships, "no progress" was evident in attempts to make her change her behavior. He reported that "Diane has not, in the past, and does not presently show any desire or willingness to address her problems."

14. ¶Diane's sister testified that she frequently has observed Diane and Jerry's unstable relationship. She stated that she has observed bruises and other signs of Jerry's physical abuse, and provided corroboration for Diane's own accounts of physical abuse and altercations. She further stated that she has also observed Diane's neglect for her children, lack of parenting skills, and alcohol abuse.

15. ¶A Yellowstone County deputy attorney also testified to Diane's reports made to her, during the summer of 1998, of Jerry's abuse, and her desire to have him prosecuted. Diane's Department case worker testified, corroborating Diane's failure to comply with the treatment plan. Both Diane and Jerry testified at the hearing as well. Although she admitted she had not complied with the drug and alcohol testing, as well as the visitation schedule, she maintained that her relationship with Jerry was 100 percent better, she had been sober for two-and-a-half years, and was ready to resume parenting her daughters along with Jerry, who she characterized as a good father.

16. ¶The report of Dr. Honeyman, who did not testify, questioned the validity of any testing given to Diane, however, due to her "educational deficits, her intelligence

level, or some neurological damage based on her prior history of alcoholism." Honeyman reported that Diane had difficulty understanding the meaning of words as well as seventh-grade level concepts involved with the tests he conducted. Consequently, "[b]ecause the results of her current MMPI (a personality test) were so radically different from those in Dr. Chessen's report, there is some question about her ability to comprehend the concepts necessary to be adequately evaluated."

17. ¶The court nevertheless concluded that testimony and evidence established beyond any reasonable doubt in a clear and convincing fashion that the continued custody by either parent of the children in this case would "result in serious emotional and/or physical damage to these children." Specifically, the court concluded that Diane's condition and conduct "render her unfit and unable to provide these children with adequate parental care" and have not "sufficiently improved over the past three years and are unlikely to change within a reasonable time." Therefore, the court concluded it was in the children's best interests to "terminate the parent-child relationship between them and their natural parents . . ."

18. ¶Diane appeals the findings and conclusions of the District Court.

## Standard of Review

1. ¶This Court reviews a district court's conclusions of law to determine whether the court interpreted the law correctly. *See In re J.N.*, 1999 MT 64, ¶ 11, 293 Mont. 524, ¶ 11, 977 P.2d 317, ¶ 11 (citations omitted). We review the court's findings of fact to determine whether the court's findings are clearly erroneous. *In re J.N.*, ¶ 11 (citations omitted). A finding of fact is clearly erroneous if it is not supported by substantial evidence; if the district court misapprehended the effect of the evidence; or if, after reviewing the record, this Court is left with a definite and firm conviction that the district court made a mistake. *In re J.N.*, ¶ 11 (citations omitted).

2. ¶This Court has further stated that "a natural parent's right to care and custody of a child is a fundamental liberty interest, which must be protected by fundamentally fair procedures." *In re J.N.*, ¶ 12 (quoting *In re R.B., Jr.* (1985), 217 Mont. 99, 103, 703 P.2d 846, 848) (citations omitted). Thus, a district court must adequately address each applicable statutory requirement before terminating an individual's parental rights. *In re J.N.*, ¶ 12 (citations omitted). Additionally, the party seeking to terminate an individual's parental rights has the burden of proving by clear and convincing evidence that the statutory criteria for termination have been met. *In re J.N.*, ¶ 12 (citations omitted).

3. ¶Finally, when considering the criteria for termination, courts must give primary

consideration to the best interests of the child as demonstrated by the child's physical, mental, and emotional conditions and needs. Section 41-3-609(3), MCA. *See also In re B.C.* (1997), 283 Mont. 423, 430, 942 P.2d 106, 110 (citation omitted).

## Discussion

*Was there sufficient evidence to support termination of the natural mother's parental rights?*

1. ¶Although conceding that an appropriate, court-approved treatment plan was not successful, Diane argues that the evidence establishing that her conduct and condition were unlikely to change within a reasonable time, was not "clear and convincing." Her position rests primarily on the written report of Dr. Honeyman, which she contends sufficiently rebuts other testimony upon which the court relied in terminating her parental rights. The last two sentences of Dr. Honeyman's two-page report submitted into evidence state: "Can they adequately parent? My professional opinion is that [the] possibility exists if they continue to work in counseling and stay substance free."

2. ¶The District Court adjudicated T.F., B.F., and B.F., youths in need of care pursuant to § 41-3-102, MCA (1997), and terminated Diane's parental rights pursuant to § 41-3-609, MCA (1997). The court reached its conclusions pursuant to the following provisions under § 41-3-609, MCA:

(1) The court may order a termination of the parent-child legal relationship upon a finding that any of the following circumstances exist:

. . .

(e) the child is an adjudicated youth in need of care and both of the following exist:

(i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and

(ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time;[1] or

(f) the parent has substantially failed to successfully complete or meet the goals of a treatment plan approved by the court and the child has been in an out-of-home placement for a cumulative total period of 1 year or longer.[(2)]

1. ¶In reaching a conclusion that the conduct or condition of a parent that renders her unfit is unlikely to change in a reasonable time, a district court is guided by § 41-3-609(2), MCA (1997). The District Court in this instance followed subsection (a) which allows the court to consider "emotional illness, mental illness, or mental deficiency of the parent of a duration or nature as to render the parent unlikely to care for the ongoing physical, mental, and emotional needs of the child within a reasonable time;" subsection (b) which allows consideration of "a history of violent behavior by the parent;" subsection (d), which suggests that the court may consider "excessive use of intoxicating liquor or of a narcotic or dangerous drug that affects the parent's ability to care and provide for the child"[(3)] and (g) which provides that a court may consider "any reasonable efforts by protective service agencies that have been unable to rehabilitate the parent."[(4)]

2. ¶In accordance with our standard of review, we first conclude that the District Court, in reaching its determination, thoroughly addressed each and every facet of all applicable provisions afforded to Diane under Montana's child abuse and neglect law. Our review here does not require such thoroughness.

3. ¶Under § 41-3-609(f), MCA (1997), parental rights may be terminated if "the parent has substantially failed to successfully complete or meet the goals of a treatment plan approved by the court and the child has been in an out-of-home placement for a cumulative total period of 1 year or longer." In this instance, the three children have been in custody for at least three years. Under this provision, which was in full effect during these proceedings, speculation as to the parent's likely course of conduct in the future is not required. Thus, we need only review whether the evidence clearly and convincingly demonstrates that Diane substantially failed to successfully complete or meet the goals of a treatment plan. Even disregarding Diane's own concession, we conclude she has not.

4. ¶The three most recent court-approved treatment plans in 1998 required compliance with clear fundamental tasks associated with parenting. Diane needed to secure a stable financial status sufficient to meet her children's needs, undergo psychological evaluation in order to assess her mental health and parenting abilities, maintain regular contact with her children, submit to urinalysis testing, and establish a healthy and safe living environment for her children, which of course included the

absence of domestic violence of any kind. The testimonial evidence clearly and convincingly demonstrates that Diane has substantially failed in each and every one of these areas.

5. ¶Throughout 1998, Diane remained unemployed, relying on social security disability benefits. She did not provide evidence of the amount or duration of this income. She testified that she owes the motel where she is living $700 in rent at the time of the hearing.

6. ¶The evidence showed that she did not seek evaluation under the three plans until one month prior to the hearing, which led to four or five sessions with Dr. Honeyman. As for demonstrating her commitment to parenting, she routinely avoided scheduled visits with her children, only to offer disingenuous excuses later.

7. ¶Diane claimed, at the time of the hearing, that she had been sober for two-and-a-half years, but provided no substantial evidence to validate this assertion. She failed to establish any sort of credible record of urinalysis testing in 1998. Namely, she would not submit to any. One of her last recorded urinalysis tests, in December of 1997, tested positive for amphetamines, which contradicts her sworn testimony that she has never used illegal drugs in her life. She testified that she uses Valium, sleeping pills and Dravocet (a pain medication) on a daily basis.

8. ¶And, finally, she obtained a healthy and safe living environment by establishing residency at a motel with the very person who has physically and emotionally tormented her for the better part of a decade. Police were called to Diane and Jerry's residence as recently as May of 1998 for a domestic disturbance that they told police never became "physical." Diane testified that she did not consider herself a victim of domestic abuse.

9. ¶We conclude that the District Court relied on substantial evidence in determining that the goals, which the foregoing tasks were designed to achieve, were not completed or met as required under § 41-3-609(f), MCA. Finally, as this Court has stated time and time again, the needs of the child are *always* paramount to rights of the parent. *See, e.g., In re W.Z.* (1997), 285 Mont. 16, 25, 946 P.2d 125, 131 (citations omitted). While there is some evidence that both Diane and Jerry are attempting to make a better life for each other, they have simply failed to show that they were willing, when required, to take whatever steps were necessary to retain custody of their children under the court-ordered treatment plans. We agree with and affirm the District Court's decision that, after three to five years of foster care, it is clearly in the best interests of the three children that this matter not be delayed any further, and that Diane B's parental rights be terminated.

10. ¶Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ J. A. TURNAGE

/S/ KARLA M. GRAY

/S/ WILLIAM E. HUNT, SR.

/S/ TERRY N. TRIEWEILER

1. Subsection (e) was designated (f) under the current, 1999 Montana Code Annotated, but is otherwise the same.

2. This subsection was deleted from § 41-3-609, MCA, in 1999.

3. This subsection was designated (c) under the 1999 Montana Code Annotated, but is otherwise unchanged.

4. This subsection was deleted from § 41-3-609, MCA, in 1999.