No. 97-650

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 128

IN THE MATTER OF THE CUSTODY AND
THE PARENTAL RIGHTS OF

J.H., R.H., D.H., and R.H.,

Youths in Need of Care.

APPEAL FROM:   District Court of the First Judicial District,
In and for the County of Lewis and Clark,
Honorable Thomas C. Honzel, Judge Presiding.

COUNSEL OF RECORD:

For Appellant:

Jeremy Gersovitz, Assistant Public Defender, Helena, Montana

For Respondents:

Honorable Joseph P. Mazurek, Attorney General; Mark
Mattioli,
Assistant Attorney General, Helena, Montana

Mike McGrath, County Attorney; Carolyn Clemens, Deputy
County Attorney, Helena, Montana

Randi Hood, Helena, Montana (Guardian Ad Litem)

Submitted on Briefs:  April 9, 1998

Decided:May 28, 1998
Filed:

_____
Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

In proceedings before the First Judicial District Court, Lewis and Clark County, Michelle Hamlin's custodial rights as the mother of J.H., R.H., D.H., and R.H. were awarded to the Montana Department of Public Health and Human Services. Hamlin appeals. We affirm.

The issue is whether the District Court abused its discretion when it awarded Hamlin's custodial rights to the Department.

J.H., R.H., D.H., and R.H. were declared youths in need of care in November 1995. At that time, the children were living with their maternal aunt and uncle because their father was in jail for domestic abuse and their mother, Hamlin, was having trouble seeing to their needs, such as getting them to school. Hamlin and the children's father were divorced. The aunt and uncle's home became the children's foster care placement. At the time of the June and July 1997 hearing on the Department's petition to terminate Hamlin's parental rights, J.H., R.H., D.H., and R.H. ranged in age from three to eleven years old and had been living with their aunt and uncle for two years.

When the children were declared youths in need of care, Hamlin and the Department entered into a treatment plan agreement which, by its terms, could be completed within six months. The plan required Hamlin to: submit to therapy for co-dependency, self-esteem, and other issues relating to her failure to adequately care for the children; successfully complete an anger management program to address domestic violence issues; successfully complete parenting classes; attend a survivor group to deal with victimization; demonstrate her ability to parent through employment, stable housing, and attending to her emotional needs; schedule and maintain visits with the children without entertaining others during those visits; continue to work in the Healthy Start program; and obtain a chemical dependency evaluation and follow the recommendations of that evaluation.

The Department presented evidence that Hamlin initially had been consistent about visiting her children under her treatment plan, but when she was reminded that she was not to bring others with her to visit her children, she began missing visits. In January 1996, she told her sister with whom the children were living that she was leaving town permanently, but told her sister not to tell the children. Hamlin then moved to Wyoming with her boyfriend.

After Hamlin moved to Wyoming, her Helena, Montana, caseworker arranged for an interstate compact to allow her to complete her treatment plan in Wyoming. However, Hamlin did not keep her Wyoming caseworker informed of her changing whereabouts. The Wyoming caseworker notified the Montana caseworker in September 1996 that he wanted to close the case because he was unable to locate Hamlin.

The Department presented testimony that although Hamlin's chemical dependency evaluation resulted in a recommendation that she obtain inpatient chemical dependency treatment, she did not show up for such treatment when

it was arranged for her. In Wyoming, she attended one mental health counseling session and had not started parenting classes. She did not complete other counseling as required under her treatment plan. She had not maintained stable housing or employment. She claimed that she underwent a second chemical dependency evaluation which concluded that she was not chemically dependent, but she did not have the written results because she was unable to pay for the evaluation.

8  After she moved to Wyoming, Hamlin initially maintained telephone contact with the children but that ceased in October 1996. Although she sent the children Christmas presents and birthday presents from Wyoming, the birthday presents all arrived late. Hamlin visited her children on three days in May 1996 when she had a court appearance in this matter. There were no other visits between Hamlin and the four children between January 1996 and the June and July 1997 hearing.

9  The three oldest children were all receiving mental health counseling. All three suffered from psychological problems which the counselor identified as resulting from living in their parents' violent and chaotic household and then being confused about why they no longer lived with their parents. Their counselor testified that they did not view living with their mother as a possibility for them in the future. Hamlin's oldest son suffered from a chronic, low-grade depression. The second-oldest child, R.H., suffered from an anxiety disorder. D.H. had some depression and repression of emotions and had "acted out" by starting fires. The youngest child, R.H., was less than one year old when he moved in with his aunt and uncle and did not remember Hamlin.

10  All the professionals agreed that the children desperately need permanency--to know where they will be living for the long term. By all accounts, the children have improved in school attendance and performance and emotionally while living with their aunt and uncle's family. The aunt testified that the children love their mother and miss her, but that they do not want to move to Wyoming. She further testified that she and her husband were willing to commit to long-term foster care of all four children.

11  The court determined that Hamlin had failed to comply with the provisions of her treatment plan and that she had abandoned the children by failing to have any contact with them between May of 1996 and the hearing. The court further determined that the children needed to be placed permanently, and that this needed to happen immediately: "The children cannot wait any longer to see if their mother might someday become an adequate parent to them." The court determined that it was in the best interests of the children to remain in the home of their aunt and uncle, and awarded their care and custody to the Department until they are eighteen years of age, with the recommendation that they be placed with the aunt and uncle. The court further ordered that Hamlin shall have contact with the children only if the Department determines contact to be in the children's best interests, and that any visits shall be therapeutically supervised unless the children's therapist determines that supervision is not necessary.

12  In a companion case, the District Court placed the custodial rights of

the children's father with the Department.  The father did not appeal, but Hamlin does.

DISCUSSION

13    Did the District Court abuse its discretion when it awarded Hamlin's custodial rights to the Department?

14  Although Hamlin, in her brief, characterizes the District Court's decision as one terminating her parental rights to her children, the court did not terminate her parental rights.  The court concluded in part as follows:

> The State has presented a compelling case to terminate [Hamlin's] parental rights to the children and to place the children with the Department with the right to consent to the adoption of the children.  Under the unique circumstances of this case, however, the Court concludes that it would not be appropriate to do so, at least at this time.

Instead, the court declared  J.H., R.H., D.H., and R.H. youths in need of care and awarded Hamlin's custodial rights to the children to the Department until each child reaches the age of eighteen.

15  This Court reviews findings of fact to determine whether the findings are clearly erroneous, and we review conclusions of law to determine whether they are correct.  The transfer of a child's custody from his or her parents to the Department is dependent upon an initial determination that the child is abused or neglected and is then a discretionary determination which this Court reviews for abuse of discretion.  Matter of C.M. (1997), 281 Mont. 183, 186, 932 P.2d 1063, 1065.

16  Section 41-3-404, MCA (1995), provides for adjudicatory hearings to declare a child a youth in need of care.  Then  41-3-406(1), MCA (1995), goes on to provide:

> If a youth is found to be a youth in need of care under 41-3-404, the court may enter its judgment, making any of the following dispositions to protect the welfare of the youth:
> (a)  permit the youth to remain with the youth's parents or guardian, subject to those conditions and limitations the court may prescribe;
> (b)  grant an order of limited emancipation to a youth who is 16 years of age or older as provided in 41-3-408;
> (c)  transfer legal custody to any of the following:
> (i)  the department;
> (ii)  a child-placing agency that is willing and able to assume responsibility for the education, care, and maintenance of the youth and that is licensed or otherwise authorized by law to receive and provide care of the youth; or
> (iii)  a relative or other individual who, after study by the department or a licensed child-placing agency designated by the court, is found by the court to be qualified to receive and care for the youth;
> (d)  order any party to the action to do what is necessary to give effect to the final disposition, including undertaking

medical and psychological evaluations, treatment, and counseling that does not require an expenditure of money by the
    department unless the department is notified and a court hearing
    is set in a timely manner on the proposed expenditure.  The
    department is the payor of last resort after all family, insurance,
    and other resources have been examined.
        (e)  order further care and treatment as the court considers in the best interest of the youth that does not require an
    expenditure of money by the department unless the department
    is notified and a court hearing is set in a timely manner on the
    proposed expenditure.  The department is the payor of last resort
    after all family, insurance, and other resources have been
    examined.  [Emphasis added.]

Under this statute, a stipulation that a child is a youth in need of care empowers a district court, in its discretion, to transfer legal custody of the child from the parent(s) to the Department.  See Matter of C.M., 281 Mont. at 187, 932 P.2d at 1066.

17  In this case, as the Department points out, Hamlin stipulated that her children were youths in need of care.  Under Matter of C.M., it was then within the discretion of the District Court to determine whether the welfare of the children would be protected by transferring their legal custody to the Department.

18  Hamlin disputes the court's conclusion that she "totally" failed to comply with provisions of the treatment plan and that it was highly unlikely that she could or would remedy her problems within a reasonable amount of time.  She submitted records of counseling she independently obtained in Wyoming.  However, those records indicate that the counseling Hamlin sought in Wyoming related almost exclusively to issues between her and her boyfriend.  The record also contains a letter from Hamlin's Wyoming caseworker stating that Hamlin had stopped attending parenting classes in September 1996.  Two letters from agencies in Wyoming state that Hamlin did not complete anger management classes and that she attended a battered women's support group only one or two times.

19  Hamlin also disputes the court's conclusion that she abandoned her children by failing to have any contact with them from May 1996 to June 1997.  This apparently relates to her allegation that her rights should not be terminated because any evidence to that effect relates to domestic abuse she suffered at the hands of her former husband, the children's father.  However, she does not elaborate upon that claim, and the evidence does not support the statement that her problems parenting her children were due solely to abuse she suffered at the hands of their father.

20  The only contact Hamlin initiated with her children from Wyoming--phone calls-- terminated when her sister stopped accepting collect calls from her after she called irregularly and insisted on having her boyfriend participate in the calls.  The Montana caseworker testified that he wrote to Hamlin in January 1997 concerning acceptable conditions and scheduling of phone calls

from her to her children, but Hamlin did not respond to his letter. The children's counselor testified that the children made a videotape and sent it to their mother, but they never received any response.

21  Hamlin's plan for the future, as she related to the children's counselor, was to return to Wyoming, to try to see the children every six months, and to resume her telephone contact with them. Twenty months after the children were declared youths in need of care, she did not have a residence large enough to accommodate four children, and she had not arranged for the children to visit her in Wyoming. Hamlin had not completed her treatment plan and had in fact been out of contact with her children for the majority of time since her treatment plan was initiated. Hamlin's position is that she needs more time to get her life in order. However, the evidence clearly established that, for their emotional health, these children need finality of placement now.

22  Hamlin cites the goal set forth at  41-3-101(1)(d), MCA, of preserving the unity and welfare of the family whenever possible. After reviewing the record, we conclude that goal has been forwarded by the recommendation of the District Court that the children be placed with their aunt and uncle and the provisions regarding visitation by the parents.

23  We hold that the District Court did not abuse its discretion in determining that to protect the welfare of J.H., R.H., D.H., and R.H., their custody should be transferred to the Department. We therefore affirm the decision of the District Court.

/S/  J. A.  TURNAGE

We concur:
/S/  KARLA M. GRAY
/S/  W. WILLIAM LEAPHART
/S/  JAMES C. NELSON
/S/  TERRY N. TRIEWEILER