No. 99-671

## IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 78

---

IN THE MATTER OF THE CUSTODY
AND PARENTAL RIGHTS OF M.W. AND C.S.,
Youths in Need of Care.

---

APPEAL FROM:    District Court of the First Judicial District,
In and for the County of Lewis and Clark,
Honorable Dorothy McCarter, Judge Presiding

**FILED**

MAY - 1 2001

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

COUNSEL OF RECORD:

For Appellants:

Julia W. Swingley, Helena, Montana (For Father)

R. Clifton Caughron, Caughron and Associates, Helena, Montana
(For Mother)

Jeremy Gersovitz, Assistant Public Defender, Helena, Montana
(Guardian Ad Litem)

For Respondent:

Honorable Joseph P. Mazurek, Attorney General; Carol Schmidt,
Assistant Attorney General, Helena, Montana

Mike McGrath, County Attorney; Carolyn Clemens, Deputy
County Attorney, Helena, Montana

---

Submitted on Briefs:  September 21, 2000

Decided:  May 1, 2001

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 Heather, the natural mother of M.W. and C.S., and Jeremy, the natural father of M.W., separately appeal the First Judicial District Court's order of July 26, 1999, terminating their parental rights. The District Court found that the children were adjudicated youths in need of care and that the best interests of the children required termination of the parental rights of both Jeremy and Heather. We affirm the termination of Jeremy's parental rights to M.W. We reverse the termination of Heather's parental rights to both children.

¶2 The following issues are raised on appeal:

I. Did the District Court err when it terminated Jeremy's parental rights?

II. Did the District Court err when it terminated Heather's parental rights?

### Standard of Review

¶3 This Court reviews a district court's conclusions of law to determine whether the court interpreted the law correctly, and we review a court's findings of fact to determine whether the court's findings are clearly erroneous. *In re J.N.*, 1999 MT 64, ¶ 11, 293 Mont. 524, ¶ 11, 977 P.2d 317, ¶ 11. A finding of fact is clearly erroneous if it is not supported by substantial evidence; if the district court misapprehended the effect of the evidence; or, even if substantial evidence exists and the effect of the evidence has not been misapprehended, if this Court is left with a definite and firm conviction that the district court made a mistake. *In re M.A.E.*, 1999 MT 341, ¶¶ 17-18, 297 Mont. 434, ¶¶ 17-18, 991 P.2d 972, ¶¶ 17-18.

¶4 The termination of parental rights invokes fundamental liberty interests which must be protected by fundamentally fair procedures. *In re J.N.,* ¶ 12; *Santosky v. Kramer* (1982), 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599. Thus, a district court must adequately address and the party seeking to terminate parental rights must prove each of the applicable statutory requirements before terminating an individual's parental rights. *In re J.N.,* ¶ 12 (citations omitted). Additionally, courts must, when considering the criteria for termination of parental rights, give primary consideration to the best interests of the child as demonstrated by the child's physical, mental, and emotional needs. *In re J.N.,* ¶ 13.

## Factual Background

¶5 Heather is the natural mother of both C.S. and M.W., and Jeremy is the natural father of M.W. In August of 1992, the children began living with Heather's mother, Patricia. Two months later, Heather signed a "Consent to Adopt" statement allowing Patricia to adopt C.S. and a "Transfer of Parental Rights and Custody Agreement" authorizing Patricia to care for M.W. Although the "Consent" was not filed with the court, the court did appoint Patricia as guardian of C.S. in September of 1993. In November 1993, shortly after Jeremy was granted sole custody of M.W., he signed a statement giving Patricia authority to care for M.W. until January 1994. This statement also was not filed with the court. Jeremy was subsequently convicted of killing his girlfriend and her child and sentenced to two life terms with no parole eligibility for sixty years.

¶6 Patricia contacted the Casey Family Program (the Program), seeking financial assistance and respite services in March of 1995. The Program in turn contacted the Department of Public Health and Human Services (DPHHS) which pursued emergency financial assistance for Patricia. Heather and Patricia met with the Program, and in November of 1995, C.S. and M.W. were enrolled. Heather was remarried at that time, and she and her husband had a five-month-old child. DPHHS requested that the development of a treatment plan be waived until the Program and DPHHS believed that Heather would be able to successfully complete a plan. The long-term plan was that eventually Heather and her husband would complete a treatment plan so that Heather could regain custody of C.S. and M.W.

¶7 In February of 1996, the Court held a hearing on the State's "Petition for Temporary Investigative Authority, Protective Services and Temporary Custody, for Termination of Parental Rights of [Jeremy] and Permanent Legal Custody with Right to Consent to Adoption, and for Adjudication of the Youths as Youths in Need of Care." Because Heather was living in Oregon at the time and the State apparently failed to notify her of the hearing, the State moved to vacate Heather's hearing set for February 16, 1996. Jeremy and his attorney were present at the February 16 hearing after which the court issued its order that C.S. and M.W. were youths in need of care, that DPHHS would have temporary custody of M.W. with respect to Jeremy, that Jeremy's parental rights would be addressed after the

Supreme Court ruled on his criminal appeal, and that Heather's parental rights would be addressed at a subsequent hearing.

¶8 In March of 1996, Heather, without benefit of legal counsel, met with the deputy county attorney, a DPHHS social worker and an attorney for C.S. and M.W., to sign a stipulation prepared by the County Attorney's office agreeing that the youths were youths in need of care and granting DPHHS temporary custody of the youths until they reached the age of 18. Jeff, C.S.'s father, also stipulated that C.S. was a youth in need of care and granted DPHHS temporary custody of C.S. until he reached the age of 18. Jeff's stipulation stated that C.S. should be placed in foster care with Patricia, but if Patricia could no longer care for C.S., Jeff could work to complete a treatment plan. Both of these stipulations were approved by the court.

¶9 The Program's records also include an undated document signed by Heather stating that Heather placed her children in temporary legal custody with DPHHS on several conditions: 1) Heather's parental rights would remain intact; 2) the children would live with Patricia; 3) the Program would manage the children's cases; 4) Heather would always have contact with her children even if the Program was required to intervene between Heather and Patricia; and 5) at an appropriate time, when Heather was ready, the Program, DPHHS and Heather would devise a treatment plan which she would complete in order to regain custody.

¶10 Subsequent to the court's approval of these stipulations, the Montana State Legislature enacted § 41-3-412, MCA, requiring a permanency plan hearing within twelve months after

5

a court finds that a child is a youth in need of care. DPHHS interpreted this legislation as necessitating a change in the previously acceptable plan that C.S. and M.W. would remain in temporary foster care with Patricia until they were eighteen years old. DPHHS drafted treatment plans which Heather and Jeff signed and the court approved in August of 1998.

¶11 Within five months of the court's approval of the treatment plans, the State filed a petition for the termination of the parental rights of Heather (based on failure to successfully complete the treatment plan and a belief that the conduct and condition making her an unfit parent was unlikely to change within a reasonable time), and of Jeremy (no treatment plan had been prepared for Jeremy on the basis that, due to his incarceration, even if Jeremy were to successfully complete a treatment plan, he would be physically incapable of parenting M.W.). The court appointed attorneys for Heather and Jeremy pursuant to § 41-3-401(12), MCA.

¶12 During the hearing held on March 2, 1999, several therapists and social workers recommended that C.S. be placed in Jeff's custody and that M.W. be placed in a therapeutic foster home. At that time, Heather testified that she did not think it would be in the best interests of the children for them to be removed from their home with Patricia and placed in her custody. She testified that she wished for both children to continue living with Patricia. Patricia testified that she wanted to adopt both children.

¶13 Before the court issued a ruling, Patricia unexpectedly died. Because of the changed circumstances, the State requested a supplemental hearing which was held on April 26, 1999.

Patricia's death made Heather's original wishes impossible to realize, and she began work to complete her treatment plan in an attempt to regain custody of C.S. Heather testified that because of M.W.'s special needs, she should be placed with Heather's aunt. The position of the State and the guardian ad litem remained the same: that C.S. should live with his father and M.W. should be placed in a therapeutic foster home.

¶14 On July 21, 1999, Jeremy and his attorney attended the hearing on the termination of Jeremy's parental rights. The court allowed neither evidence nor testimony (other than the fact of Jeremy's incarceration and the length of his sentence) to be presented at that hearing.

¶15 On July 26, 1999, the court issued an order in which it concluded that it was in the children's best interest to adopt the permanency plans proposed by DPHHS and the guardian ad litem and to terminate the parental rights of both Heather and Jeremy. The court denied Heather's motion to reconsider and on motion, amended the order's language to allow continued contact between M.W. and Jeremy if M.W.'s adoptive parents thought such contact was in M.W.'s best interest.

## Discussion

¶16 I. Did the District Court err when it terminated Jeremy's parental rights?

¶17 A. Did the District Court err when it determined that the implementation of a treatment plan was impractical in light of the fact that Jeremy would be incarcerated with no parole eligibility for sixty years?

¶18 The State petitioned to terminate Jeremy's parental rights pursuant to § 41-3-609(1)(e)(i), (ii) and (4)(b), MCA, which provides as follows:

7

(1) The court may order a termination of the parent-child legal relationship upon a finding that any of the following circumstances exist:

. . . .

(e) the child is an adjudicated youth in need of care and both of the following exist:

(i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and

(ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time. . . .

. . . .

(4) A treatment plan is not required under this part upon a finding by the court following hearing if:

. . .

(b) the parent is incarcerated for more than 1 year and a treatment plan is not practical considering the incarceration . . . .

¶19  Jeremy acknowledges that M.W. was an adjudicated youth in need of care but argues that the District Court erred when it found that the implementation of a treatment plan would be impractical in light of Jeremy's extended incarceration. Jeremy relies on our decision in *In re W.Z.* in which we emphasized that before a district court may terminate parental rights, it must first establish a treatment plan, "unless a showing of facts clearly proves the impossibility of any workable plan." *In re W.Z.* (1997), 285 Mont. 16, 29, 946 P.2d 125, 133.

¶20  In *In re W.Z.*, the District Court terminated the father's parental rights although DPHHS had not attempted to create or implement a treatment plan with prison programs that might have been incorporated into an acceptable plan. We concluded that the District Court erred when it held that the mere fact of an unknown release date, by itself, made a treatment plan impractical. A six-year sentence, with an unknown release date, does not necessarily constitute clear proof of the impossibility of any workable plan.

8

¶21 Treatment plans are intended to improve a parent's ability to meet a child's needs in order to help the parent regain custody and preserve the parent-child relationship. In the case at hand, the District Court confronted facts that were substantially different from those present in *In re W.Z.* In Jeremy's case, no treatment plan could cure the fact of his extended incarceration. No treatment plan devised by DPHHS could remedy the fact that Jeremy will be incarcerated, without possibility of parole, for sixty years. By the time Jeremy will be eligible for parole, M.W. will be over sixty herself. Obviously, Jeremy's incarceration presents an insurmountable, long-term impediment to his ability to provide for his child's physical, mental, and emotional needs. Therefore, under the facts of this case, we conclude that the District Court did not err when it determined that the facts clearly showed a treatment plan was impractical.

¶22 Since a treatment plan was not required, the District Court needed only to consider whether Jeremy's conduct or condition rendering him unfit as a parent is unlikely to change within a reasonable period of time, pursuant to § 41-3-609(1)(e)(ii), MCA. Section 41-3-609(2), MCA, requires that the court consider "present judicially ordered long-term confinement of the parent" when determining whether the conduct or the condition of the parent renders the parent unfit, unable, or unwilling to give the child adequate parental care. Pursuant to that statute, the District Court appropriately found that Jeremy's sentence to two life terms rendered him unable to provide M.W. with adequate parental care. Section 41-3-609(3), MCA, further provides that:

In considering any of the factors . . . in terminating the parent-child relationship, the court shall give primary consideration to the physical, mental, and emotional conditions and needs of the child.

¶ 23 In the case before us, the record supports the court's determination that Jeremy's long-term confinement so severely limits his parenting abilities that a continuation of the parent-child relationship is not in the child's best interests. The record further supports the District Court's determination that Jeremy could not resume his parental responsibilities of caring for his child within a reasonable time.

¶24 B. Did the court violate Jeremy's right to counsel when it failed to "provide an opportunity" for Jeremy to be represented at two hearings held to address the children's permanency plan and the termination of Heather's parental rights?

¶25 The fundamental liberty interest in a parent's right to the care and custody of a child requires that the State provide a fundamentally fair procedure for the termination of parental rights. *Santosky*, 455 U.S. at 753-54, 102 S.Ct. at 1395, 71 L.Ed.2d. at 606-07. We have previously held that fundamental fairness requires that a parent be represented by counsel at proceedings to terminate parental rights in order to "have an equal opportunity to present evidence and scrutinize the State's evidence." *In re A.S.A., J.L.A., G.A. and A.J.A.* (1993), 258 Mont. 194, 198, 852 P.2d 127, 129.

¶26 Jeremy claims that the two hearings in March and April were held to "terminate the parental rights of M.W." and that he should therefore have been present, with counsel. However, both of those hearings addressed the State's petition to terminate Heather's parental rights. The State's petition to terminate Jeremy's parental rights was addressed at the July

hearing which both Jeremy and his attorney attended. Jeremy presents neither authority nor argument for his proposition that a parent must be allowed to take part in a hearing to terminate the other parent's rights. We decline to adopt such a rule.

¶27 Jeremy further argues that he should have been allowed to challenge the evidence presented by the State regarding M.W.'s permanency plan. As the court explained during Jeremy's hearing, the issue of a child's placement is separate from the issue of terminating parental rights. The social workers and therapists testified in the earlier hearings as to what placement would best serve the interests of the children. Jeremy acknowledges that the testimony involved "recommendations for [M.W.'s] future custody," rather than any evidence regarding Jeremy's capabilities as a father. Jeremy himself cites our rule that in child protective proceedings culminating in the termination of parental rights, due process of law requires only that the parents have counsel prior to the permanent custody hearings. Due process does not require that the parents have counsel during the initial stages of the proceedings. *In re T.C. & R.C.* (1989), 240 Mont. 308, 314, 784 P.2d 392, 396. The court, therefore, was not required to provide Jeremy with an opportunity to scrutinize and challenge the evidence and witnesses presented at the permanency plan hearings held prior to the hearing to terminate his parental rights. We hold that the court did not err in failing to require that Jeremy be represented at the permanency plan hearing.

¶28 C. Did the District Court violate Jeremy's right to due process when it failed to provide him with the opportunity to present testimony and scrutinize the State's evidence during the hearing on the termination of his parental rights?

11

¶29 On July 21, 1999, the District Court refused to allow Jeremy to testify on his own behalf or to present evidence at the hearing on the State's petition to terminate his parental rights. Jeremy argues that this refusal violated his due process rights. We enunciated in *In re A.S.A.* that a parent should be provided with the opportunity to present evidence in a termination proceeding. *In re A.S.A.,* 258 Mont. at 198, 852 P.2d at 129.

¶30 At the hearing, the court refused to allow Jeremy's mother to testify on the basis that although her testimony was relevant to M.W.'s *placement*, it was not relevant to Jeremy's ability to father the child. The court also refused Jeremy's request to testify on the basis that nothing Jeremy could say could alter the fact that he would be unavailable to parent for sixty years.

¶31 Furthermore, for this Court to review an alleged error, an objection generally must be made at the time the court made the alleged error, and it must be specific so that the court is given an opportunity to correct itself. *State v. Huerta* (1997), 285 Mont. 245, 260-61, 947 P.2d 483, 492-93. The record indicates that Jeremy's counsel's response to the court's refusal to allow Jeremy to testify was, "Okay." In the absence of an objection on the record, the issue is not preserved on appeal, and we decline to consider the issue.

¶32 However, even if we considered the issue, and assuming we found that the court erred in refusing to allow Jeremy to testify, Jeremy has failed to demonstrate how such error adversely affected the outcome of the hearing. Jeremy has not suggested that in testifying,

he could have shown the court that he would be able to provide for his child's physical, mental, and emotional needs. Having failed to do so, he has not established reversible error.

¶33 D. Did the court violate Jeremy's right to counsel when it appointed the Lewis and Clark Public Defender's office to represent him, Heather and both children?

¶34 Jeremy argues first that because he rejected an attorney from the Public Defender's office in an earlier criminal trial, the court's appointment of the same Public Defender's office to represent him in this case was "a flimsy and ineffectual appointment . . . made for the record."

¶35 On the first day of his criminal trial, Jeremy told the court that he did not wish to be represented by the two court-appointed attorneys from the Public Defender's office. *State v. Woods* (1997), 283 Mont. 359, 374-75, 942 P.2d 88, 98. When the court strongly recommended against his rejection of counsel and asserted that the attorneys were providing highly competent legal assistance, Jeremy unequivocally insisted that he would represent himself at trial. *Woods,* 283 Mont. at 374-75, 942 P.2d at 98. Later, during the proceedings to terminate his parental rights, the court appointed the same Public Defender's office to represent Jeremy.

¶36 The rule that a defendant's right to effective assistance of counsel does not grant a defendant the right to counsel of his choice is equally applicable to this proceeding in which Jeremy was entitled to court-appointed counsel. *State v. Craig* (1995), 274 Mont. 140, 148-49, 906 P.2d 683, 688. Here, Jeremy may not have liked his counsel, but he has not

13

suggested, nor does the record indicate, that his attorney provided anything but competent legal assistance. Jeremy was entitled to assistance of counsel, but not to counsel of his choice. Jeremy provides no authority for his argument that his rejection during a criminal trial, of attorneys from the Public Defender's office (whom the court deemed to be competently representing him), should somehow require that the court find alternative counsel for him in a later proceeding. We therefore reject the argument that Jeremy's right to counsel was denied.

¶37 Jeremy's second argument is that when the court appointed the same office to represent Heather, Jeremy and both children, the court created a conflict of interest that violated his right to counsel. As sole authority in support of his argument, Jeremy cites Rule 1.7 of the Montana Rules of Professional Conduct, which provides generally that a lawyer shall not represent a client if the representation of that client will be directly adverse to another client.

¶38 Jeremy has failed to explain how his interests were directly adverse to Heather's or M.W.'s. However, even if we were to assume, arguendo, that Jeremy's interest was directly adverse to his child's or to Heather's interest and that a rule of professional conduct had been violated, such violation standing alone is insufficient to sustain a claim that Jeremy's right to counsel was violated. We have previously held a person "must prove not that various disciplinary rules were breached in his opinion; rather he must demonstrate that [the attorney] failed in his legal duty." *Carlson v. Morton* (1987), 229 Mont. 234, 240, 745 P.2d

14

1133, 1137. Similarly, Jeremy's allegation that the Public Defenders had a conflict of interest does not automatically create the presumption that Jeremy's right to counsel has been violated.

¶39 In a recent case involving the question of an alleged conflict of interest, we held that a trial court may consider attorney violations of the Rules of Professional Conduct if such misconduct results in prejudice or adversely impacts the rights of the parties. *Schuff v. A.T. Klemens & Son,* 2000 MT 357, ¶ 35, 16 P.3d 1002, ¶ 35, 57 St.Rep. 1499, ¶ 35. An appellant therefore must present evidence establishing that the representation created an actual conflict of interest that in fact prejudiced the appellant. Jeremy has failed to even allege, much less provide substantial evidence, that the alleged rule violation prejudiced him in any manner. We therefore reject this argument as well.

¶40 Finally, Jeremy suggests that his right to counsel was violated when no attorney appeared on his behalf at the two hearings held in March and April of 1999 to address Heather's parental rights and the children's permanency plans. Pursuant to our holding above in subsection B, that neither our case law nor our statutes require court appointment of counsel for placement hearings, or for hearings involving another parent's rights, we reject this contention that Jeremy was denied his right to counsel.

¶41 We hold that the District Court did not err when it terminated Jeremy's parental rights after determining that the implementation of a treatment plan for Jeremy was impractical. Jeremy has not presented evidence or authority for his claims that his right to counsel was

in any way denied during proceedings to terminate his parental rights. We therefore affirm the District Court's termination of Jeremy's parental rights to M.W.

¶42    II.  Did the District Court err when it terminated Heather's parental rights?

¶43    Heather argues that the entire case was fundamentally flawed and that termination of her parental rights therefore should be reversed. Heather contends that M.W. and C.S. were not adjudicated youths in need of care, and the court therefore could not satisfy the statutory requirements to terminate her parental rights. Heather claims that she entered into a stipulation with the State that M.W. and C.S. were youths in need of care only upon several conditions. These conditions, listed in a separate document were: 1) Heather's parental rights would remain intact; 2) the children would live with Patricia; 3) the Program would manage the children's cases; 4) Heather would always have contact with her children even if the Program was required to intervene between Heather and Patricia; and 5) at an appropriate time, when Heather was ready, the Program, DPHHS and Heather would devise a treatment plan which she would complete in order to regain custody.

¶44    At the March hearing, when the State first proposed a permanency plan that involved removing the children from Patricia's care, the State failed to abide by those conditions, and, Heather contends, the stipulation that M.W. and C.S. were youths in need of care was therefore voided. Once the stipulation was voided, she asserts, M.W. and C.S. could not be considered youths in need of care, and the court had no authority to terminate her parental rights. Heather also contends that Patricia's sudden and unexpected death in the middle of

16

the proceedings changed the circumstances so significantly that the court should have allowed more time for her to complete the treatment plan.

¶45 The State responds that the conditional document was signed by Heather alone, some four months before the later stipulation that Heather, the Program and the State signed, and therefore cannot be enforced against the State. The State also alleges that the adjudication of M.W. and C.S. as youths in need of care that occurred in February 1996 was sufficient for purposes of terminating parental rights.

¶46 For the District Court to have the jurisdictional authority to award DPHHS custody of M.W. and C.S., the court needed to determine that they were youths in need of care. *In re J.B.* (1996), 278 Mont. 160, 164, 923 P.2d 1096, 1099. A youth in need of care is defined as a "youth who is abused or neglected." Section 41-3-102(22), MCA (1997). A finding of abuse or neglect is therefore a jurisdictional prerequisite for a court to order the transfer of custody, and determination that M.W. and C.S. were youths in need of care would need to have been based on evidence of abuse or neglect by Heather. Child abuse or neglect is defined as:

> (i) harm to a child's health or welfare; or
> (ii) threatened harm to a child's health or welfare.
> (b) The term includes harm or threatened harm to a child's health or welfare
> by the acts or omissions of a person responsible for the child's welfare.

Section 41-3-102(6), MCA.

¶47 However, we have also held that a stipulation that a child is a youth in need of care, when filed with the court, may be treated as an adjudication for the purposes of § 41-3-404,

MCA, and, therefore, may suffice for purposes of terminating parental rights pursuant to § 41-3-609, MCA. *In re J.H.,* 1998 MT 128, ¶ 16, 289 Mont. 111, ¶ 16, 958 P.2d 1191, ¶ 16. While a stipulation may be an acceptable alternative to an adjudicatory hearing in many circumstances, the fundamental nature of the rights of a parent requires that the process by which a stipulation is drafted and signed needs to be closely scrutinized. This stipulation was drafted by the County Attorney and signed by Heather without legal counsel. Because the stipulation allowed the court to determine M.W. and C.S. to be youths in need of care without having adjudicated that the children were in fact abused or neglected, and without hearing from Heather as required by § 41-3-402, MCA, we will evaluate whether Heather's fundamental rights were adequately protected during the proceedings.

¶48 Heather argues that had an adjudicatory hearing been held, the court would have had no basis for declaring M.W. and C.S. youths in need of care. She alleges, and the record supports, that no evidence suggested the children had been abandoned or were either abused or neglected, or in danger of being abused or neglected. Testimony at trial indicated that Heather did not have a substance abuse problem, had not abandoned her children, had neither a history of mental or emotional illness nor a history of violent behavior. In fact, experts testified at trial that she was doing a fine job of raising another child.

¶49 The State's claim that the hearing held on February 16, 1996, to address Jeremy's parental rights, was an adequate adjudication of M.W. and C.S. as youths in need of care in regards to Heather is specious. Recognizing that Heather had a right to be heard, the State

18

itself moved to vacate Heather's hearing as it had failed to provide her with sufficient notice, and she would not be present. Additionally, if the State truly believed that Jeremy's hearing on February 16, 1996, sufficed as an adjudication in regards to any person other than Jeremy, there would have been no need to draft and have Heather and Jeff sign two separate stipulations that M.W. and C.S. were youths in need of care. The State itself clearly also understood that Jeremy's hearing had not adjudicated M.W. and C.S. as youths in need of care in regards to either Jeff or Heather. We therefore hold that the February 16, 1996, hearing did not adjudicate that M.W. and C.S. were youths in need of care in regards to Heather.

¶50 Heather makes a compelling argument that she reasonably believed the State would abide by her conditions–most significantly, the conditions that required that her parental rights would remain intact and that the children would remain with Patricia until Heather was ready to complete a treatment plan.

¶51 Additionally, Heather points to the stipulation signed by Jeff, C.S.'s father, who, contrary to Heather, was represented by an attorney when he signed his stipulation. Jeff's stipulation contained an important clause, absent in Heather's stipulation but very similar to one of Heather's conditions: "In the event that Patricia . . . is no longer able to care for [C.S.], it is agreed that Jeff . . . may choose to work a treatment plan aimed at reuniting him with [C.S.], or Jeff shall be involved in the plans for [C.S.]'s placement." This provision protected

Jeff's parental rights in precisely the way that Heather, unassisted by legal counsel, thought her rights were protected by the conditions she had signed prior to executing the stipulation.

¶52    At the first hearing to terminate her parental rights, Heather testified that she felt conflicted about removing her children from Patricia's care because she feared it would be very disruptive for them as they had lived with Patricia for most of their lives. Due to these conflicted feelings, and relying on her understanding that DPHHS would neither remove the children from Patricia's home, nor terminate her parental rights, Heather did not complete her treatment plan.

¶53    Until shortly before the March hearing, Heather thought DPHHS, pursuant to the conditions to the stipulation, would recommend that the children stay with Patricia. Only a few days after the first hearing, Patricia unexpectedly died. Patricia's death suddenly and drastically changed the circumstances for M.W. and C.S. as well as for Heather. Heather promptly began work towards completion of the treatment plan and had made significant progress, particularly considering the very recent death of her mother, by the time of the second hearing. Recognizing that Patricia's death had changed the situation, the State moved for and the court granted a supplemental hearing. Despite the change in circumstances resulting from Patricia's death, the District Court did not grant Heather additional time to complete her treatment plan.

¶54    In light of the unique facts of this case, we hold that the District Court incorrectly found that the stipulation sufficed as an adjudication that M.W. and C.S. were youths in need

of care in regards to Heather. Without such an adjudication, the court lacked the jurisdictional prerequisite to terminate Heather's parental rights pursuant to § 41-3-609(e), MCA. We therefore reverse the District Court's termination of Heather's parental rights.

/s/ W. William Leaphart
Justice

We concur:

/s/ Karla M. Gray
Chief Justice

/s/ Terry Trieweiler

/s/ Jim Regnier

Justices