No. 00-502

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 270

IN THE MATTER OF
S.S., K.C., and J.C.,

     Youths in Need of Care.

APPEAL FROM:    District Court of the Eighth Judicial District,
                     In and for the County of Cascade,
                     The Honorable Marge Johnson, Judge presiding.

COUNSEL OF RECORD:

       For Appellant:

            Vince Van Der Hagen, Office of Public Defenders, Great Falls,
            Montana

       For Respondent:

            Hon. Mike McGrath, Attorney General; Ilka Becker,
            Assistant Attorney General, Helena, Montana

            Brant Light, Cascade County Attorney; Susan Brooke,
            Deputy County Attorney, Great Falls, Montana

                          Submitted on Briefs:  September 19, 2002

                                     Decided:    November 26, 2002

Filed:

                                      Clerk

Chief Justice Karla M. Gray delivered the Opinion of the Court.

¶1    The natural father of J.C. appeals from the order terminating his parental rights entered by the Eighth Judicial District Court, Cascade County.  We reverse.

¶2    The issue is whether the District Court erred in terminating the father's parental rights to J.C. based on abandonment.

BACKGROUND

¶3    In April of 1998, the District Court granted the Department of Public Health and Human Services (Department) protective custody of J.C.'s older half-siblings, S.S. and K.C., due to neglect and, in addition, possible physical abuse by the mother's boyfriend.  When J.C. was born in November of 1998, she and her mother both tested positive for marijuana.  The Department took protective custody of J.C. the day after she was born and placed her in foster care. J.C. subsequently was added to this youth in need of care proceeding and she remained in foster care throughout the action.

¶4    J.C.'s natural father, who is not the father of S.S. or K.C., was in prison before J.C.'s birth and remained there through the permanent legal custody hearing in April of 2000.  Paternity was established by testing in March of 1999.  At a status hearing on August 31, 1999, the District Court ordered the Department to develop a treatment plan for J.C.'s father and appointed counsel to represent the father.

¶5    No treatment plan was developed for the father and he did not attend any of the hearings except the termination hearing held in April of 2000.  At the close of that hearing, at which the father

2

testified, the District Court terminated the father's parental rights on the basis that the father had abandoned J.C.

¶6 The children's mother relinquished her rights to J.C. This appeal involves only the father's parental rights to J.C.

DISCUSSION

¶7 Did the District Court err in terminating the father's parental rights to J.C. on the basis of abandonment?

¶8 A parent's right to the care and custody of a child is a fundamental liberty interest which must be protected by fundamentally fair procedures. For that reason, the State must show by clear and convincing evidence that a parent has abandoned a child before parental rights may be terminated. *In re A.E.* (1992), 255 Mont. 56, 59, 840 P.2d 572, 574 (citations omitted). Additionally, when considering the criteria for termination of parental rights, courts must give primary consideration to the best interests of the child as demonstrated by the child's physical, mental and emotional needs. *In re M.W.*, 2001 MT 78, ¶ 4, 305 Mont. 80, ¶ 4, 23 P.3d 206, ¶ 4 (citations omitted). We review factual findings under the clearly erroneous standard and conclusions of law to determine if they are correct. *In re W.Z.* (1997), 285 Mont. 16, 21, 946 P.2d 125, 128 (citations omitted).

¶9 Abandonment is statutorily defined as "leaving a child under circumstances that make reasonable the belief that the parent does not intend to resume care of the child in the future." Section 41-3-102(1)(a), MCA. Although a six-month time frame applies for establishing abandonment under an alternative statutory definition of abandonment, no express time frame applies to the definition of

3

abandonment at issue here. *See* § 41-3-102(1)(b), MCA; *A.E.*, 255 Mont. at 60, 840 P.2d at 575.

¶10 The father contends the District Court's finding of fact that he left J.C. under circumstances that made reasonable the belief that he did not intend to assume or resume her care in the future is clearly erroneous. He states he repeatedly informed the Department of his intent to assume care of J.C. upon his release from prison and that he completed several programs while in prison which demonstrated that intent.

¶11 The Department concedes that the father may not have subjectively intended to abandon J.C. It contends, however, that the father gave the impression to others that he did not intend to assume her care. The record does not support the Department's position.

¶12 The father testified that he initiated paternity testing through the Department of Corrections when he learned of J.C.'s birth. He was told that he would have to contact the mother to get photographs of--or information regarding--J.C., and he did so. He further testified that he wrote to the Department in May or June of 1999 stating his intent not to give up his rights as a father.

¶13 The father also testified that he talked with the Cascade County prosecuting attorney in May of 1999 and informed him that he would like to participate in the hearings by telephone. He testified that the attorney gave him the impression that J.C.'s mother was following the Department's recommendations. The father testified he received only after-the-fact notice of six hearings

4

prior to the termination hearing, and had difficulty contacting his attorney.

¶14 The father further testified that he wrote to Judy Hartelius, the Department community social worker assigned to J.C.'s case, twice but received no response from her. In addition to sending the Department documentation of his participation in church and completion of chemical dependency, parenting and anger management classes, he provided documentation showing his prison discharge date, his parole status and his prerelease status. At the time of the termination hearing in April of 2000, the father was scheduled to discharge his sentence in October of 2000 and had been accepted to prerelease.

¶15 J.C.'s mother testified that the father was incarcerated weeks after she became pregnant and, as a result, was not available to take her to neonatal care or for J.C.'s birth. She testified he had contacted her and asked her for photographs of J.C., which she sent him.

¶16 Hartelius testified that the father had written to her stating he would like to be considered for parenting, but she had made no efforts to set up a treatment plan for him. She had suggested to the father that he take parenting and chemical dependency classes and, upon her request, he sent her several diplomas he earned while in prison: GED, church attendance, anger management, and chemical dependency. She testified that "[h]e would basically have fulfilled any treatment plan that we would have requested."

¶17 Hartelius further testified that she received a letter from the father in October of 1999, in which he requested an address so he could send J.C. a birthday card and possibly receive some photographs of her. Hartelius testified that she did not respond to the father's letter, explaining that she could not give out J.C.'s address. On cross-examination, she admitted she could have acted as a go-between to get a birthday card from the father to J.C. and she had no excuse for failing to do so.

¶18 J.C.'s foster mother testified that the father had no contact with her, but that he could have contacted her only through Hartelius. She testified that Hartelius had not asked her to provide the father with any information regarding J.C.'s health or progress.

¶19 J.C.'s guardian ad litem wrote in an October 12, 1999 report to the court that she spoke with J.C.'s father in October of 1999, at which time he reported he was taking a parenting class, was scheduled to go before a pre-release screening committee later that month, and "definitely want[ed] to be a part of [J.C.'s] life." The father told the guardian ad litem he did not wish to break a promise he had made to the mother that he would not take her child away from her or use the child against her, and it was his impression that the mother would be able to do the things she needed to do to get her children back, so he had "backed off . . . waiting to see what would happen."

¶20 The Department attempts to fault the father for failure to communicate with it. On this record, however, the failures were the Department's in not developing a treatment plan for the father

6

as ordered by the District Court, and in not responding to the father's communications. Contrary to the Department's assertions, the father communicated with J.C.'s mother, the county attorney's office, the guardian ad litem, and Hartelius concerning J.C. and his intent to parent her if the mother was unable to do so.

¶21 Before closing, it is appropriate to respond to several matters addressed in Justice Rice's heartfelt dissent. First, while it is true that the father did nothing until J.C. was four months old, the reason--as stated above--is that his paternity was first established at that time. Indeed, the father himself initiated the paternity testing through the Department of Corrections.

¶22 In addition, while faulting the father for his lack of "enduring" contacts with Hartelius, the assigned social worker, Hartelius testified--as also mentioned above--that the father did contact her and express his interest in being considered for parenting, but she made no effort to set up a treatment plan for him. Indeed, Hartelius and the Department failed to develop a treatment plan for the father even after being ordered to do so in August of 1999. Thus, while Justice Rice places the fault on the father, he totally overlooks the fact that the Department did not follow through with the father, even after being ordered to do so. One could speculate that the Department may have already chosen to "go for" the abandonment theory with regard to the father, but the fact remains that it is the Department's obligation to provide a treatment plan when the parent expresses interest and, at the very latest, when the District Court orders it to do so. Justice Rice's approach essentially would require a parent to

7

affirmatively ensure that the Department does not violate his or her constitutional rights with regard with his or her parenting. The law is clearly, and properly, to the contrary.

¶23 Furthermore, while Justice Rice quotes the father's statement at the hearing that it "would be cruel" to wait until he was ready to parent J.C., the fact remains that the statement is irrelevant to the basis on which the District Court terminated the father's parental rights, namely, abandonment. Abandonment is retrospective in nature, and requires evidence from the past to support a reasonable belief that the parent has left a child under circumstances indicating that the parent does not intend to resume care of the child.

¶24 Finally, Justice Rice is--unfortunately--entirely correct in his belief that the system has failed in this case. He also is correct that the delays from the time the notice of appeal was filed until the case reached this Court for decision are insufferable and inexcusable; sadly, there is plenty of "blame" to be shared. We cannot, however, make legal decisions based on who is most to "blame" for delays in getting an appeal to this Court. Our job is to apply the law.

¶25 We conclude the District Court's finding that the father left J.C. under circumstances making reasonable the belief that he did not intend to resume or assume her care in the future, thereby abandoning her, is not supported by substantial credible evidence and is clearly erroneous. As a result, we reverse the District Court's order terminating the parental rights of J.C.'s father and remand for further proceedings consistent with this Opinion.

8

/S/ KARLA M. GRAY

We concur:

/S/ JAMES C. NELSON
/S/ JIM REGNIER
/S/ TERRY N. TRIEWEILER

Justice Jim Rice dissenting.

¶26    I respectfully dissent.  I believe there is substantial evidence in the record to support the District Court's finding of abandonment.

¶27    "Abandonment" is defined in relevant part as "leaving a child under circumstances that make reasonable the belief" the parent does not intend to resume care of the child.  Section 41-3-102(1)(a), MCA.  In large part, finding the "reasonableness of a belief" is a subjective determination which a district court must draw from the evidence before it and the credibility of the witnesses.

¶28    There is no evidence that Father did anything whatsoever in regard to J.C. until March 1999, four months after she was born, when he simply requested pictures from J.C.'s mother.  Although Father asserted that this lack of involvement during this period was premised upon an understanding he had with Mother, the District Court was free to accept or reject Father's offered rationale for his noninvolvement by assessing his credibility on the witness stand.  The District Court did not accept Father's explanation.  Although this Court endorses Father's explanation in ¶ 19, I see no reason to substitute our judgment for that of the District Court.

¶29    The Court then rejects the State's argument that Father failed to communicate with the Department by stating at ¶ 20:

> Contrary to the Department's assertions, the father communicated with J.C.'s mother, the county attorney's office, the guardian ad litem, and Hartelius concerning J.C. and his intent to parent her if the mother was unable to do so.

10

Consideration of the substance and timing of these various actions, however, reveals that the father's efforts were not as enduring as might be implied.

¶30 After Father's request for pictures of J.C. in March 1999, another two months lapsed wherein he did nothing on behalf of J.C. In May 1999, now six months after J.C. was born, Father called Deputy County Attorney Harris and expressed his interest in fathering J.C. Significantly, Harris advised Father that it was critical that Father stay in touch with Social Worker Hartelius. The urgency of Harris' advice was most appropriate, because, by then, Father had failed to express his interest in caring for J.C. for the first six months of her life.

¶31 Thereafter, Father mustered the effort to write two letters and make one phone call in the next five months, as J.C. approached one year of age. The Department filed a petition in October 1999.

¶32 Father engaged in all of the referenced actions noted by the Court, and quoted above, in or before October 1999, at least six months prior to the termination hearing. Thus, at the time of the hearing in April 2000, the District Court had no evidence before it indicating that Father had made any effort in regard to J.C. for the preceding six months. This failure of effort occurred despite prosecutor Harris' admonition to Father to maintain contact with the social worker and his receipt of all notices of the proceeding. Consequently, two six-month periods of time in J.C.'s life passed by with no involvement of Father.

¶33 I would find that Father's minimal inquiries between May and October 1999, and his failure of effort for the other, substantial

11

periods of J.C.'s life, constitute substantial evidence to support the District Court's finding of abandonment. The District Court was convinced that these circumstances made it reasonable to believe that Father did not intend to resume care of J.C., and I would not reverse that conclusion. As we have said:

> In determining whether to terminate parental rights, "the district court is bound to give primary consideration to the physical, mental, and emotional conditions and needs of the children," thus "the best interests of the children are of paramount concern in a parental rights termination proceeding and take precedence over the parental rights." *In re J.W.*, ¶ 8 (citation omitted). ***We will presume that a district court's decision is correct and will not disturb it on appeal unless there is a mistake of law or a finding of fact not supported by substantial evidence that would amount to a clear abuse of discretion.*** *In re E.W.*, ¶ 14 (citations omitted).

*In re E.K.*, 2001 MT 279, ¶ 33, 307 Mont. 328, ¶ 33, 37 P.3d 690, ¶ 33 (emphasis added).

¶34    Appropriately, the District Court was very concerned about the best interests of J.C. The District Court discussed this issue with Father at the hearing:

> THE COURT: . . . This case is about you're [sic] daughter. Do you really think it's in the best interest of that child to have to wait until you can get ready to parent her and to take her from the parents she had been bonded with since her birth? Is that what you think?
>
> FATHER: That would be cruel.
>
> . . . .
>
> THE COURT: . . . [T]he law has come to recognize as many, many studies have shown, I think you probably appreciate, that children can't always wait.
>
> They're growing, they're changing, and they're needing someone right there all the time for them. There's no doubt in the case of your daughter that the [foster parents] have been those people. They have been providing good care, and I think if you get to know them you would like them.

12

The District Court then terminated Father's rights and recommended that the adoption of J.C. would be an "open" adoption which would allow for communication with Father and Mother. In so doing, I believe the District Court reached a valid conclusion. Time moves on, a child continues to grow, and a permanent parental presence is vital. A parent must do more than simply express an interest in a child, and then fail to act for substantial periods of the child's life. For the reasons set forth above, I believe that the District Court's findings were not clearly erroneous and were supported by substantial evidence. I would affirm.

¶35 The Court endorses and relies upon the various excuses offered by Father for his failure to be involved, as if the District Court somehow overlooked them. Father testified that he was not initially involved because of an agreement with Mother (¶ 19), that prosecutor Harris "gave him the impression" that Mother was completing the Department's recommendations (¶ 13), and that he had difficulty contacting his attorney (¶ 13). The District Court did not buy these excuses, and this Court should not buy them either.

¶36 A review of the register of action in this case reveals that J.C.'s parents were not the only ones who failed to act in J.C.'s best interests. The appeal from the District Court's order was filed June 7, 2000. The case then suffered one delay after another, due to the fault of many, before being forwarded to this Court for decision on September 5, 2002–some two and one-half years after the District Court's decision. This delay is insufferable and inexcusable. J.C. was born on November 22, 1998. Thus, she was four years old this month and still resides with her foster parents. Four years after J.C.'s birth, the legal issues surrounding her future are not yet resolved, and she has no permanent home. And now, we reverse this case and require J.C. to

13

start all over again.  The parents, the lawyers, the judges, the imperfect system—we have all failed J.C.  Although I find herein that Father was guilty of abandonment, truly the same could be said for all of us in the system.  I am grateful for the dedication and patience of J.C.'s foster parents, who are the solitary source of light in this matter, and in the life of J.C.

/S/ JIM RICE